UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| LISA STOUT, individually and the marital community composed of Lisa and Ray C. Stout, | Civil Action No. CV07-0682-JCC |
| Plaintiff, | |
| v. | |
| UNITED AIR LINES, INC. | |
| Defendant | |

## EXPERT REPORT OF DANIEL M. KASPER

SEPTEMBER 2, 2008

**EXHIBIT E**

## I.    IDENTIFICATION & ASSIGNMENT

1.  I am a Managing Director of LECG, LLC. (formerly, The Law & Economics Consulting Group) and head of the firm's transportation practice.  LECG provides expert analysis and management consulting in economics, accounting, and finance. My business address is 350 Massachusetts Avenue, Suite 300, Cambridge, Massachusetts 02319.  I have over 25 years of experience at LECG, Coopers & Lybrand, L.L.P., Harbridge House, Inc., and the U.S. Civil Aeronautics Board ("CAB") dealing with issues involving competition, competition policy, economics, finance and damages in the aviation and other transport-related industries.

2.  I have also served on the faculties of the Harvard Business School and the University of Southern California School of Business Administration for a total of ten years. In 1993, I was one of 15 appointed members of the U.S. National Airline Commission, a body created by Congress to evaluate and make recommendations on how to improve the performance of the U.S. airline and aerospace industries.  In addition, I have served as a consultant to the U.S. Departments of Transportation, State, and Defense on various aviation and transportation industry matters, and I have also testified as an expert on airline and aviation industry matters before courts and federal administrative agencies, as well as legislative bodies and antitrust authorities, both in the United States and abroad.

1

3.  I have held senior level positions at the United States Civil Aeronautics Board (including Director of International Aviation) where my responsibilities included, *inter alia*, the formulation and implementation of the Board's antitrust and other economic regulatory powers with respect to the airline industry. I have authored two books on aviation as well as numerous articles, case studies, and research papers on various aspects of air transportation and government policy. I earned my M.B.A. and J.D. degrees from the University of Chicago. A copy of my curriculum vitae, including a list of my testimony over the last five years and list of publications over the past ten years is provided as Appendix A.

4.  I have been retained by United Air Lines Inc. ("United" or "the Company") to provide a preliminary independent evaluation of the claims of economic damages made by Lisa Stout, a former United pilot. This expert report contains a statement of my preliminary opinions as well as the bases for those opinions, and is supported by the work that I have performed or supervised to date. The preliminary opinions set forth in this report are based upon my review and analysis of: (i) relevant documents and data in this matter as provided to us by counsel and the Company; (ii) relevant articles and publicly available information sources; (iii) conversations with Company officials; and (iv) my own knowledge and experience from working and consulting in the aviation industry for the past 25 years. My investigation and consideration of the issues in this matter is ongoing. Accordingly, my opinions are subject to revision based on the work I may complete in the future and further documents, data, testimony, and other materials, including any

2

damages reports prepared on behalf of the plaintiff, that I may subsequently review.  My professional fees for this matter are $600 per hour.

## II.    OVERVIEW AND SUMMARY

5.  Ms. Stout was a United pilot between October 29, 1990, when she became a Flight Officer, and August 9, 2005 when she was officially grounded for medical reasons. Ms. Stout alleges that the work environment at United and the combination of actions taken (and not taken) by United forced her to stop flying.  She initiated this action to recover actual and punitive damages that she purports to have incurred as a result of United's conduct.  The actual damages claimed by Ms. Stout likely will include the economic loss resulting from the loss of her class one pilot's license, which makes her ineligible to fly commercial passenger aircraft.

6.  For purposes of calculating the economic losses, if any, suffered by Ms. Stout, I have assumed that the claims made by Ms. Stout are proven. Thus, for the purpose of this preliminary analysis, I assume that as a result of United's conduct, Ms. Stout has been unable to serve as a commercial pilot for United or for any other airline.

7.  The plaintiff has not yet submitted a report that estimates the damages Ms. Stout allegedly suffered.  Because the plaintiff's damage analysis is likely to include information that would be material for my calculation, I will provide my formal damage

estimate in a Rebuttal Report after reviewing their calculations. In this preliminary report, I will provide an overview of the appropriate methodology for estimating damages under the circumstances alleged.

8. Ms. Stout's claim of economic damages will likely include a claim based on the loss of income resulting from the alleged conduct of the Company. But the amount of lost income that Ms. Stout expected to earn as a pilot for United is not the only factor that must be considered in estimating economic damages. Rather, consideration must also be given to other payment streams Ms. Stout is receiving that may offset at least some of the loss of income she would have been expected to earn as a pilot for United. It is also necessary to consider possible alternative income streams she could have earned even if she was unable to return to United (or another commercial airline) as a pilot. Thus, there are at least three payment streams that need to be considered in order to accurately assess economic damages.

   a. The first income stream relates to the payments Ms. Stout would have been expected to earn as a pilot for United, less any non-reimbursable expenses she would have incurred in performing her pilot duties.

   b. The second income stream relates to disability payments. Ms. Stout has, and can be expected to continue to receive, regular disability payments from United. In addition, Ms. Stout also receives payments under a "loss of license" group insurance policy obtained under the auspices of the Air Line Pilots Association ("ALPA"). The monthly payments from these insurance policies constitute an

4

income stream that must be offset against her claims of lost income as a pilot for United.

   c. Finally, I understand Ms. Stout has a legal duty to mitigate any damages she experienced as a result of United's alleged conduct. Thus, income streams she could have reasonably expected to receive from other employment for which she is qualified should also be deducted from any damages claimed for loss of income as a pilot for United.

9. The economic damages (if any) suffered by Ms. Stout would thus be equal to the difference in the values of the income stream she could have expected to earn as a United pilot and the income streams she could expect to receive in the alternative. The value of these income streams is derived by taking the expected future net income or payments and discounting them back to the date of the trial.[1] Thus, the computation of economic damages also requires a determination of the appropriate discount rates to be applied to these hypothetical future income streams.

10. In the remainder of this report, I discuss the most important elements to be considered in reliably estimating the economic damages attributable to United's alleged conduct (once again, under the assumption that Ms. Stout's allegations regarding the Company's conduct are proven).

---

[1] Ms. Stout may also have experienced a loss of income and economic damages from the date of the grounding to the date of the trial. Any such damage calculation would follow the same methodology as discussed in Section III of my report.

5

## III.   PRELIMINARY ANALYSIS OF DAMAGE ISSUES

### a) Lost Pilot Income

11. For each month Ms. Stout was an active duty pilot, she would have received an income

based on her flying hours plus any applicable overrides or incentive pay.[2]  According to

United's collective bargaining agreement ("CBA") with its pilots union, pilots are paid an

hourly rate, where paid or "credited" hours are based on a combination of the number of

hours actually flown (i.e., "hard hours") and the number of hours a pilot is on duty.[3]  The

hourly rate is based on three factors:  the aircraft the pilot operates, the pilot's "seat" (i.e.,

whether the pilot serves as a Captain or First Officer), and the pilot's seniority.

12. At the time that Ms. Stout stopped flying for United, she was a Boeing 737 ("B-737")

Captain based in Seattle, Washington.  She became a pilot at United on October 29, 1990,

and thus, at the time she stopped working, she had nearly 15 years of seniority, which

was enough to become a Boeing 757 or 767 Captain.[4]  Because she had previously turned

down opportunities to move up to the higher paying position of B-757/767 Captain, I

---

[2] Under the United-ALPA Collective Bargaining Agreement, pilots receive additional pay for international and late night flights (i.e., between 11 pm and 6:59 am).  See *2003 Agreement Between United Air Lines, Inc. and The Air Line Pilots in the service of United Air Lines, Inc., Represented by The Air Line Pilots Association International*, (hereafter "United-ALPA CBA"), Section 3-B.

[3] In addition to being paid for the hours they actually fly an aircraft, commercial airline pilots also receive credit for a number of non-flying hours based on various formulae, and consequently, a pilot's paid or "credit" hours are usually significantly higher than his or her actual flight hours.  For example, according to section 5-G-3-b-(2) of the *United-ALPA CBA*, "For B-737-300/500 and A-320/319 pilots, schedules shall contain a duty period 'look back' value of five (5) hours per duty period for trips actually flown (including deadhead) or a field standby assignment, or a 'look back' value of four and one half (4.5) hours times calendar days worked in the month.  'Work Day' for purposes of the previous sentence includes a flying assignment performed, sick leave and field stand-by, but excludes 'shaded day(s)' as described in 5-G-1-d-(1).  There are no other duty RIGS or other synthetic time included."

[4] Under the current *United-ALPA CBA*, pilots on the 757 and 767 aircraft receive the same hourly pay rates.

6

have assumed that Ms. Stout would continue to fly the B-737 as long as that aircraft remained in service at United. In addition, though wage rates are determined by years of service, hourly pay rates do not increase for United pilots with more than 12 years of seniority in any given position (e.g., B-737 Captain).[5]

13. United recently announced plans to remove all B-737 aircraft from its fleet starting this fall.[6] Thus, had she maintained her status as an active pilot, Ms. Stout would have been required to operate a different aircraft type. Because United expects to furlough approximately 1,450 pilots as a result of eliminating 100 aircraft from its mainline fleet (i.e., a reduction of more than 20%), there is some uncertainty as to what aircraft she would have flown in the future if she had remained on active status. I assume that after these furloughs work their way through United's seniority-based "bumping" system, Ms. Stout would hold the position of an Airbus A-320 Captain (which has the same pay rates as the Boeing 737). I may revise this assumption once more information becomes available about the effect of the impending furloughs on pilot staffing at United.

14. The wage rates from 2005, when Ms. Stout was grounded, through 2009, were established by the Letter of Agreement ("LOA") 05-02 Bankruptcy Exit Agreement between United and ALPA that became effective on January 1, 2005. These rates were increased slightly by the Success Sharing Plan ("SSP") LOA effective May 1, 2008

---

[5] See *United-ALPA CBA*, Section 3-B.
[6] See "United Streamlines Operations to Compete in Unprecedented Fuel Environment", UAL Press release, June 4, 2008.

through the duration of the CBA (i.e., December 2009).[7]  For the period after 2009, I will assume that the hourly rates paid to United's pilots increase.  The most recent CBA contained annual increases of 1.5 percent per year.  Given the continuing economic pressures facing the airline industry (including announced plans by United and several other large U.S. carriers to furlough thousands of pilots in the coming months), I believe the assumption that hourly rates will increase at a similar rate is reasonable.

15. To compute Ms. Stout's expected monthly income, it is also necessary to estimate the number of hours for which she would have been paid had she remained on active duty status.  I assume that Ms. Stout would have been credited for the same number of hours she had averaged in her last three or so years as a B-737 Captain.  Ms. Stout's expected income would also need to take account of forgone contributions that United was required to make to her defined contribution ("DC") pension plans.  I would deduct from these income streams any non-reimbursable expenses, such as insurance premiums, Ms. Stout would have incurred as a pilot.

16. The mandatory retirement age for commercial airline pilots in the United States has recently been raised to 65.[8]  It is not certain, however, that Ms. Stout would have remained a pilot until age 65 because pilots (as well as professionals in virtually every other industry) sometimes elect to take early retirement for a variety of reasons.  I, however, make no assumption as to when she would actually retire.  I will offer separate

---

[7] For the example, the SSP LOA increased the top-of-scale (i.e., year 12) hourly pay rate for Boeing 737 or Airbus A-320 Captains from $131.15 to $133.11.
[8] See *One Hundred Tenth Congress of the United States of America, At the First Session, H.R. 4343.*

damage calculations for each year, which will allow the fact finder to determine the damages based on an independent assessment of Ms. Stout's likely retirement age.

### b) Pilot Disability Income and Insurance Proceeds

17. Ms. Stout has had two sources of income as a result of her grounding. One income source is the Pilot Disability Income that United provides its pilots. Under this policy, Ms. Stout has been receiving $7,559 per month since August 10, 2005 and can expect to receive these payments until at least until the age of 60. Whether the age of disability will be extended past the age of 60 is currently the subject of negotiations between United and ALPA.

18. This disability policy, which pays 60 percent of the highest annual salary a pilot received in the previous five years, has provided an even higher proportion of the income Ms. Stout could have expected to earn as a United pilot due to the fact that after United filed for bankruptcy in December 2002, pilot salaries were substantially reduced. Thus, Ms. Stout's monthly disability payment is based on the compensation she received *before* salaries were reduced as a result of the bankruptcy. As a result, the $7,559 per month the disability policy provides to Ms. Stout may have been more than 80 percent of the income she would have received from United if she had continued flying.[9]

---

[9] In the year beginning May 2006, Ms. Stout would have earned an hourly rate of $131.15 as a B-737 Captain. If she had been paid for 70 hours in a month, her pay would have been $9,180.50. Thus, Ms. Stout's disability payment of $7,559 per month is 82.3 percent of her salary as a pilot, assuming she was paid for 70 hours per month, which I understand is the number of hours used to calculate base pay.

9

19. Ms. Stout also has a "loss of license" policy issued by ALPA that pays $21,600 per year for four years beginning the year after she lost her license. She received her first payment on July 30, 2006 and will continue to receive payments for 48 months. Because payments under this policy are not subject to income tax, they must be increased ("grossed up") to reflect the amount of tax Ms. Stout would have paid in order to have received an after-tax income of $21,600/year.

20. The proceeds from these two insurance policies, coupled with the reduction in pilot salaries resulting from United's bankruptcy make it possible that, at least for a few years, Ms. Stout had a *higher income* as a result of her disability than she would have received had she continued operating as a pilot.

### c) *Mitigation*

21. Ms. Stout has an obligation to mitigate the loss of income stemming from her inability to fly for United. These losses could be mitigated in a number of ways. It is my understanding that Ms. Stout cannot currently fly for a commercial airline because of the medication she is presently taking. If her condition improves, the medication she is currently taking may no longer be required. In that case, she would be able to resume her career as a commercial pilot.

22. If Ms. Stout were to resume her career with United, it is my understanding she would retain her seniority, i.e., she could return in the same relative position she would have

10

been in if she had not been disabled. Thus, if Ms. Stout were to resume flying with United, any economic loss would end as of the date she resumed her career.

23. Even if Ms. Stout does not return to work as a United pilot, she would presumably be able to be productively engaged in other jobs, including those that make use of the skills she developed as a pilot. Most notably, there are a number of companies in the Seattle area that could productively use the services of former commercial airline pilots to help in the training of new pilots. For example:

- Alaska Airlines has a major training base in Seattle in which former airline pilots can provide training in a variety of fields, including flight simulators;

- Boeing has a major facility in the Seattle area and a subsidiary, Alteon, operates a training center there. Former commercial pilots are well-suited to help in the training and operation of such facilities. Flight Safety also operates a small training center in the Seattle area. Boeing may also have positions for former pilots outside of its training facility;

- Lockheed Martin also has a major facility in the Seattle area and presumably has training and other opportunities for former pilots; and,

- The FAA has a facility in the Seattle metropolitan area. Certain of the services provided by the FAA are done by flight inspectors, who are often former pilots.

11

24. It is my understanding that many of the jobs listed above pay significant salaries.[10]   I further understand that Ms. Stout would not jeopardize her payments under the disability insurance so long as the income from any such employment did not exceed 75 percent of the income on which those disability payments were based.[11]

### d) Discount Rates

25. It is a fundamental principle of economics and finance that a dollar today is worth more than a dollar received a year from now because there is an opportunity to earn a return by investing the dollar.  Thus, the amount of damages paid today for lost future income must be reduced to reflect the fact that a dollar of income in the future is less valuable than a dollar of present income.  A "discount rate" is the rate at which future income must be *discounted* to make it equal to a lump-sum amount paid in the present period.  For example, if future lost earnings for each of the next three years is $100, the present value would be approximately $272 assuming a discount rate of 5%.

26. The amount someone would be willing to accept at some future date in exchange for a dollar today also depends on the likelihood that the future payment will be made.  The less likely a future payment will be made, the higher the applicable discount rate.  For example, there is little or no payment risk on obligations of the government of the United States.  In contrast, there can be substantial risks associated with the obligations of a

---

[10] For example, it is my understanding that over the past few years, Alaska Airlines has hired several simulator instructors at starting salaries of $73,500 annually.  Likewise, an FAA flight safety inspector position pays base salaries of up to $57,700 per year (plus locality adjustments), and instructors at Alteon earn $350 per eight hour session. Source: FAA website and discussions with Alaska Airlines and Alteon Human Resources.

[11] *United-ALPA CBA*, Letter of Agreement 03-16 Section J, Paragraph 1-2, Page 461.

company or individual. The promise of the United States government to pay a dollar at some future date, therefore, is likely to be more valuable than a similar promise by a private company or individual. Accordingly, a lender would demand a greater future payment (i.e., charge a higher interest rate) to compensate for the greater the repayment risk. In other words, a higher discount rate should be applied to promises made by risky companies or individuals.

27. Airlines are a risky industry. A number of airlines, including United, Delta, Northwest and US Airways have all been forced to restructure under Chapter 11 over the past seven years, which in turn resulted in substantial wage cuts for all employee groups, including pilots. Though United, as well as other airlines, continued to operate while in bankruptcy and have ultimately re-emerged, others have been forced to liquidate. And notwithstanding United's successful emergence from bankruptcy, the recent run-up in fuel prices has posed renewed risks. Consequently, there is some uncertainty surrounding the future wages United will pay, as well as the size and scope of its network.

28. A discount rate based on U.S. Treasury bills or bonds (i.e., a "risk-free" rate) is sometimes used in damage calculations involving lost earnings.[12] In this case the relevant interest rate would be based on the number of years Ms. Stout would have likely worked before retiring. For example, if it was assumed she would have retired at the age of 62 (i.e., she would have worked for an additional 10 years), the interest rate on a 10-

---

[12] The United States government issues financial obligations of various maturities. In this instance, the appropriate maturity would coincide with the length of the obligation (i.e., damage period).

13

year bond would be appropriate. As of August 29, 2008, the interest rate on relevant 10-year U.S. Treasury constant maturity bonds was 3.79 percent.[13]  However, the use of a risk-free rate to discount obligations of an airline would essentially assume that the future income streams were guaranteed. Clearly, such an assumption is incorrect given the past and possible future plight of the industry.[14]

29. An alternative methodology would be based on the weighted average cost of capital for United or a peer group of airlines.[15]  The weighted average cost of capital for large airlines as of March 2008 was 13.1 percent, which reflects the higher risk associated with investing in the airline industry.[16]  Assuming the industry's weighted average cost of capital was the same on August 29, 2008 as it had been earlier in the year suggests that the airline industry pays a risk premium (over the risk-free rate) of approximately 9.31 percent.  However, the appropriate risk premium to assign to promises of future pilot compensation is likely to be lower. In calculating the appropriate discount rate, therefore, I believe a risk premium in the range of one half the risk premium embedded in the industry's weighted average cost of capital is likely to be appropriate. That would make the appropriate risk premium approximately 4.66 percent and the discount rate approximately 8.45 percent (i.e., the risk premium of 4.66% plus the risk free rate of 3.79%).

---

[13] Source: http://www.federalreserve.gov/releases/h15/update/
[14] It may also be appropriate to discount other income streams (i.e., disability payments) using a discount rate in between the risk free rate and the airlines' weighted average cost of capital.
[15] See, for example, HSBC Bank USA v. UAL Corporation, et. al., In re: UAL Corporation, et. al., Debtors. United States Bankruptcy Court For the Northern District of Illinois, Eastern Division.  Chapter 11, Case No. 02-B-48191, Adv. Proc. No. 04-02413.
[16] Source: *Ibbotson Cost of Capital, 2008 Yearbook*, Table 4-11.  Chicago, IL:  Morningstar.Inc.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on September 2, 2008.

Daniel M. Kasper

# APPENDIX A: CURRICULUM VITAE OF DANIEL M. KASPER

**DANIEL M. KASPER**
LECG, LLC
350 Massachusetts Avenue
Suite 300
Cambridge, MA 02139

## EDUCATION

BA, Political Science, UNIVERSITY OF KANSAS

Masters in Business Administration, UNIVERSITY OF CHICAGO

Juris Doctorate, UNIVERSITY OF CHICAGO

## PRESENT POSITION

LECG November 1997-present
<u>Managing Director, Cambridge, MA Office</u>

At LECG, Mr. Kasper has focused his practice on the transportation industry. He has provided consulting services as well as expert economic analysis and testimony for a variety of clients in both the private and public sectors in the aviation, rail, trucking and maritime industries.

## PREVIOUS EXPERIENCE

COOPERS & LYBRAND, Consulting 1993-1997
<u>Partner and Chairman Transportation Industry Program</u>

Mr. Kasper headed C&L's Transportation Industry Program where he directed a number of engagements involving domestic and international transportation clients in both the private and public sectors. He also appeared frequently as an expert witness before Federal courts, regulatory agencies, and the Congress of the United States.

UNITED STATES NATIONAL AIRLINE COMMISSION, 1993
<u>Member</u>

In 1993, Mr. Kasper was appointed and served as one of fifteen voting members of the US National Airline Commission, a body established by Congress to examine and make suggestions for strengthening the U.S. airline and aerospace industries. The Commission submitted its Report and recommendations to the President and Congress in September of 1993.

HARBRIDGE HOUSE, INC. 1983-1993
<u>Vice President, Director and Head of the Transportation Practice</u>

i

Mr. Kasper managed the firm's transportation practice and was responsible for a wide array of projects involving domestic and international transportation issues. He also served as an expert witness in numerous proceedings before Federal and state courts, regulatory agencies and legislative bodies.

## UNITED STATES CIVIL AERONAUTICS BOARD, 1979-1983
### Director of International Aviation

From January 1980 through September 1983, Mr. Kasper served as Director of International Aviation, the Board's primary advisor and chief line officer for all matters involving international aviation. During his tenure as Director, Mr. Kasper was instrumental in developing and implementing a pro-competitive U.S. international aviation policy.

### Executive Assistant to Civil Aeronautics Board Member

From July through December of 1979, Mr. Kasper served as chief staff advisor to Board Member and Vice-Chairperson Elizabeth E. Bailey. In that capacity, he was responsible for reviewing all matters pending before the Board and advising Ms. Bailey on proper disposition of those matters. Matters dealt with by the Board during that period included a number of proposed airline mergers, the allocation of takeoff and landing slots, potential barriers to entry posed by control of gates at congested airport facilities, retail marketing of air transportation, pricing policy, and a request for antitrust immunity by the International Air Transport Association.

## HARVARD UNIVERSITY, BUSINESS SCHOOL, 1976-1981
### Faculty

At Harvard Business School, Mr. Kasper specialized in two principal areas: the impact of alternative forms of government regulation on the management and performance of business organizations and on the study of national economic policies and strategies. Mr. Kasper authored a number of case studies on various aspects of the transportation and telecommunication industries.

While at Harvard, Mr. Kasper was a member and active participant in the Harvard Regulatory Reform Project conducted under the auspices of the Kennedy School of Government. He also consulted with firms in the telecommunications and computer industries to help them anticipate and prepare for the impact of telecommunications deregulation on their businesses.

UNIVERSITY OF SOUTHERN CALIFORNIA, 1971-1976
<u>Faculty</u>

While at USC, Mr. Kasper developed, administered and taught courses dealing with the control of business activities by means of direct government regulation, the enforcement of private contracts, and through the use of tort law. His research focused on the regulation of transportation, telecommunications industries and workplace safety. He also served as a member of the Faculty Senate.

## TESTIMONY SINCE 2003

### United Air Lines, Inc vs. Air Line Pilots Association

Expert report (with Darin N. Lee) and hearing testimony regarding impact of pilot job actions. United States District Court, Northern District of Illinois, Eastern Division. September 2008.

### Innovative Solutions and Support, Inc. vs. J2, Joseph Caesar, James Zachary, Zachary Technologies, Inc and Kollsman, Inc.,

Expert report and testimony regarding damages arising from alleged misappropriation of intellectual property contained in aircraft components. United States District Court, Western District of Tennessee Western Division, Case No.: 05-2665-MI P

### Alaska Airlines, Inc., et al v. Los Angeles World Airports, et al

Expert analysis of economic claims arising in a dispute over rates and charges imposed or airport tenants by Los Angeles World Airports. US DOT, Docket-OST-2007-27331, February 16, 2007.

### City of Baton Rouge et al vs. American Home Assurance Company And J. Calderera & Company, Inc.,

Expert analysis of claim for damages arising from delays in completion of an airport terminal project. January 2007. District 19th Judicial District Court, Number 493,788 Div: "D" State of Louisiana, January 2007.

### Comments on Proposed Operating Limits at New York LaGuardia Airport

Written comments on proposed operating limits at LGA. FAA Docket No. 2006-25709, December 2006 and June 2008 (with Darin N. Lee).

**Comments on Notice of Proposed Rulemaking Congestion Management for John F. Kennedy International Airport And Newark Liberty International Airport**

Written comments (with Darin N. Lee) on proposed changes in operating limits and slot allocations at JFK and EWR Docket No. FAA-2008-0517, July 2008

**Joint Application of Alitalia-Linee Aeree Italiane-S.P.A., Czech Airlines, Delta Air Lines, Inc., KLM Royal Dutch Airlines, Northwest Airlines, Inc., Société Air France**

Written expert testimony on various matters of airline industry economics and competition in conjunction with a request for antitrust immunity by carriers seeking to participate in an international aviation alliance. US DOT, OST-2004-19214, 2005.

**In Re Delta Air Lines, Inc. et al., Bankruptcy Litigation**

Expert analysis and trial testimony regarding airline industry economics, finance and competition. The United States Bankruptcy Court for the Southern District of New York, Chapter 11 Case No. 05-17923 (PCB), 2005-2006.

**In Re US Airways, Inc., et al., Bankruptcy Litigation**

Expert analysis, deposition and trial testimony regarding airline industry economics, finance and competition, The United States Bankruptcy Court for the Eastern District of Virginia, Case No. 04-13819. 2004-2005.

**In Re UAL Corporation, et al., Bankruptcy Litigation**

Expert reports and testimony on airline industry economics, finance and competition, The United States Bankruptcy Court for the Northern District of Illinois, Eastern Division, Case No. 02-B-4819, 2002-2005

**In Re Northwest Airlines, et al., Bankruptcy Litigation**

Expert analysis and trial testimony regarding airline industry economics, finance and competition. The United States Bankruptcy Court for the Southern District of New York, Chapter 11 Case No. 05-17930 (ALG), 2005-2006.

**Atlantic Coast Airlines Holdings, Inc. v. Mesa Air Group, Inc.**

Expert report and deposition testimony involving airline economics and competition in connection with an attempted acquisition. United States District Court for the District of Columbia, Civil Action No. 03-2198 (RMC), 2003/2004.

**In re Atlas Air Worldwide Holdings**

Expert analysis of air cargo markets as part of a valuation of Polar Air Cargo's ("Polar") U.S.-Japan route air cargo authority and associated slots at Narita airport in Tokyo, Japan. U.S. Bankruptcy Court, Southern District of Florida, Case No. 04-10792-BKC-RAM through 04-10796-BKC-RAM (Jointly Administered under Case Number 04-10792-BKC-RAM), 2004.

**Kalitta Air, L.L.C., v. Central Texas Airborne Systems, Inc.**

Expert analysis and deposition testimony regarding air cargo markets damages claims arising out of alleged flaws in the conversion of certain aircraft from passenger to cargo configuration. Northern District of California, 2003-2004.

**United Airlines v. Insurance Company of the State of Pennsylvania**

Expert analysis regarding airline economic losses arising from the closure of U.S. airspace and airports following the attacks of September 11th, 2001. Civil Action no. 03CV 5189 (RMB), Southern District of New York, 2004.

**Steven Geelan, et al., vs. Mark Travel, Inc.**

Expert analysis of the economic and airline industry conditions that led to the shut down of operations and the lay offs of employees in late 2001. United States District Court, District of Minnesota. Civil No. 03-6322 DSD/JSM, 2006.

## BOOKS AND OTHER PUBLICATIONS

1) "Slots, Property Rights and Secondary Markets: Efficiency and Slot Allocation at US Airports", pages 271-288, in *Airport Slots*, Achim Czerny, et. al, Editors. Ashgate Publishing, Hampshire, England, 2007.
2) *Deregulation and Globalization: Liberalizing International Trade in Air Services*, Ballinger Publishers, Cambridge, MA, 1988.
3) *The US Regional Airline Industry to 1996: Markets, Competition, and the Demand for Aircraft*, The Economist Publications, London & New York, 1987.

## PROFESSIONAL AFFILIATIONS

Member of the Illinois Bar

Member of the California Bar

Member, American Bar Association