# EXHIBIT A

# Report of Expert Analysis of John J. Nance
# in the case of
# Lisa Stout vs. United Air Lines, Inc.

---

**Prepared by:**
**John J. Nance**
**2542 Westlake Avenue N.**
**Suite 8**
**Seattle, WA 98109**
**253-606-9266**

**August 27, 2008**

**Purpose:**

**To provide independent expert opinion concerning the above case with particular reference (but not limited to) the effects of various actions on aviation safety, and the standard and desirable operating philosophies imbedded in commercial airline procedures, all based on the revolution in the understanding and incorporation of human factors/human performance considerations in the promotion of safe airline flight.**

**Data Reviewed:**

1. The depositions and materials I have studied were provided by the law office of Victoria Vreeland, Esq., the summary and listing of which is Attachment A herein. The entirety of case file materials, depositions, and other materials referenced in Attachment A were sent to my office at 2542 Westlake Avenue in Seattle by courier, or provided to me in person. No independent factual research has been done or attempted in this case.

**Qualification:**

1. Full Curriculum Vitae at Attachment B (Includes listing of all publications within last 10 years).

The author of this report has been deeply and substantively involved in the advocacy of, teaching of, and development of aviation safety improvement initiatives for the past twenty-four years. As an FAA certificated Airline Transport Pilot, I have held the positions of flight officer for Braniff International Airlines, and subsequently Alaska Airlines, flying as second officer/flight engineer, first officer/copilot, and captain on a variety of turbojet equipment in both domestic and flag operations. I am a decorated Lt. Colonel in the U.S. Air Force Retired Reserve, and began my military career as a Distinguished Graduate of USAF Undergraduate Pilot Training Class 71-08 at Williams AFB, Arizona, in 1971, and flew the Lockheed C-141A and B for twenty-three years, inclusive of six years of active duty, with more than twenty years as an aircraft commander (the military equivalent of captain) spanning both the Vietnam and

Desert Storm conflicts. Several years of intensive study and research on air accident investigation, the functions and methodologies of the N.T.S.B., and Human Factors/Human Performance in Aviation led to the critically-acclaimed non-fiction work BLIND TRUST (Wm. Morrow, New York, 1986), and a subsequent fifteen year period of involvement and advocacy in the development of human performance consciousness and understanding throughout aviation. I was one of the pioneer advocates of incorporating what began as Cockpit Leadership Resource Management at United Airlines (what became "Crew Resource Management"), and have spoken as an advocate in person and through all forms of media since 1986, inclusive of testimony before Congress and the Canadian Parliament. Having become the only freelance broadcast analyst of aviation accidents in North America who was also flying full time as an active airline pilot, in 1995 I joined the ABC Television network as the paid Aviation Analyst/Consultant for the network, and in that capacity have been involved in the analysis of each major aviation accident during the past twelve years. Although not possessed of a medical degree, for the past eighteen years I have also been deeply involved in teaching teamwork, communication, risk management, standardization, and patient-safety improvement methods to medical centers, physicians, nurses, and associated medical professional groups nationwide. I am one of the founding board members of the National Patient Safety Foundation (from 1997-2006, Executive committee member for 4 years), and administered an AHRQ grant on medical-legal problems at Southern Methodist University Law School (now Dedman School of Law) in Dallas in 2004. I am the author of the 2008 book, WHY HOSPITALS SHOULD FLY (SecondRiver Healthcare Press, 2008), and I lecture nationwide and consult on medical matters associated with these subjects, and to general industry (including the petrochemical industry) and the aerospace industry on safety-related issues. I am also a licensed attorney (state of license is Texas) currently in out-of-state non-practicing status. I do not routinely seek nor take cases as a legal consultant or expert consultant, and I have not voluntarily listed myself in such capacity with any database.

This report has been prepared in conjunction with the pending litigation in the case of Stout v. United. I was retained to review the materials supplied to me and provide expert opinions based on those materials. For this purpose, I rely on my thirty-three year association with the commercial airline business as an F.A.R. Part 121 air carrier flight engineer, pilot and captain; my extensive experience as a national and international advocate of, and spokesman for, aviation safety; my expertise as one of the pioneers in the development and advocacy of Crew Resource Management (also known as Command Leadership Resource Management) courses worldwide; my extensive involvement in the flight safety programs of the U.S. Air Force; and my thirteen years of experience in researching and evaluating air accidents as the Aviation Analyst for the ABC Television Network. In addition I rely on my continuous research and involvement with the field of air accident investigation utilized in my book BLIND TRUST, (Wm.Morrow, New York, 1986), and the associated congressional testimony and research which followed.

**Prior Cases in which I have testified as an expert or by Deposition in preceding Four Years:**

1. 2007 - Retained by Gruenstein & Hickey in Anchorage, Alaska, to consult and render

an expert opinion report on the case of Providence Health System-Washington, d/b/a Providence Alaska Medical Center v. NWAA. Prepared an expert report - no deposition.

**Compensation for Service:**

My agreed fee is $225 per hour. As of the completion of this report and this date, my total billable work hours are 14.

---

## DISCUSSION

PREAMBLE

The airline industry, especially in North America, has undergone an amazing safety revolution since the congressional enactment of the Airline Deregulation Act in 1978. The precipitous slide in airline safety that occurred during the 1980's (as evidenced by a continuous drumbeat of major air accidents caused at least in part by the pressures of deregulation) was suddenly halted and reversed during the nineties and beyond by the wholesale incorporation of an entirely new discipline applied across the board of airline operations: Human Factors. The 80's witnessed a strange setoff between two statistical curves: On one hand, the level of maintenance excellence, maintenance expenditure, and FAA oversight was declining precipitously, yet during the same period the same financially-traumatized airline industry was quietly but forcefully embracing the radical new disciplines of human factors and human performance engineering to minimize human failure tragedies. And, in many respects, the positive curve did much to minimize the deaths that would otherwise have been caused by the deleterious effects of deregulation (such as the Air Florida disaster in January of 1982). While one aspect of air safety was deteriorating, the fact that pilots for the first time were being trained to work together and listen to each other caught and cancelled cockpit mistakes that would certainly have raised the death toll, and moreover, by the late 1980's those "saves" were becoming documentable.

The radical idea behind this revolution is relatively simple: Human failure (not pilot error) had caused more than 90% of the major accidents in previous decades, and by experience it was clear that all the attempted remedies of the past - including ordering people not to fail - were ineffective. Clearly, the only way to reduce the incidence of human mistakes causing accidents was to both address the causes of human error, and look for ways to catch it in time. Since human errors can never be completely eliminated, the emergency emphasis shifted to catching mistakes before they could metastasize into incidents and accidents, and since humans often are unaware that they're making a mistake, clearly the best emergency method for changing the way pilots operated airliners was to have additional human minds checking the leader - the captain. Since at least one additional professional pilot was in each commercial cockpit, the challenge became creating a reliable, collegial level of cooperation and communication between and among the pilots without the assumption of captain omnipotence. In response, the airlines created training courses to change the very culture of the commercial cockpit. In place of industry-wide reliance on the traditional, but fatally flawed presumption that perfect human performance was achievable by individuals (the philosophy that had long guided

airline flight managers), airline training departments began incorporating the principles of Crew Resource Management (also known as Cockpit or Command Leadership Resource Management). CRM, in a nutshell, sought to eliminate the type of iconoclastic, self-omnipotent captain model that had directly contributed to so many thousands of airline deaths, and replace that model with strong leaders who defined their command prowess by how well they could fully incorporate and listen to the other expert humans (copilots etc) who were flying with them. (That discipline also required the subordinates to speak up without hesitation, <u>and without fear of retaliation</u>). At the same time, airline pilot training and checking (a form of pilot supervision) moved from the retaliatory, blame-based systems that had reigned since the dawn of aviation to a more enlightened system in which an individual pilot's mistake would initially be deemed a systemic failure necessitating an emphasis on finding out and correcting how the system might have supported that individual's mistake. While disciplinary structures of course remained, they became more intelligently used, and most often when individuals voluntarily breached the rules or procedures.

Any lingering doubts that this revolutionary approach to human collegial teamwork was effective to a staggering degree was laid to rest by the following record: For a full 5 years (between the loss of American Flight 587 in Queens, New York, in 2001, just after 9/11, and the Fall, 2006, loss of a Comair Regional Jet on takeoff in Lexington, Kentucky), not one, single airline passenger was killed in major or primary regional airline service in the United States! That incredible record of perfect safety had gone far beyond any airline safety professional's wildest dreams, yet what was equally amazing was that the only major change that had occurred in that period was the institution of CRM and the underlying operational philosophy that human vulnerability had to become a fully understood part of the safety system. When airlines admitted that their pilots could never be completely error free in their flying duties, airline leaders were saddled automatically with the public obligation to change their airline's system to fully expect human mistakes and be able to catch or absorb them safely before such mistakes could destroy a plane load of passengers. Building an operational expectation of regular, predictable human failure in place of a system expecting constant perfect professional performance was a seismic alteration in the landscape of aviation. Never before had the airline industry been charged with understanding and accommodating human weaknesses in a formal way - weaknesses that included fatigue, anger, distraction, worry, fright, and any manner of emotional upheavals. Leaders, in other words, were now faced with the reality that when such human frailties are fully accommodated, accidents are averted. When they are not, safety is compromised. Considering that airline flying fifty years ago was both low-reliability, and high-risk, the fact that today it is high-reliability and low-risk constitutes one of the most remarkable human achievements of the last century.

The reason that this preamble belongs in this Expert Analysis discussion within the context of the facts in Stout v. United is that the actions, inactions, and methods utilized in this case must be viewed against the background of what we now know is true about the human factors-centered means of securing aviation safety, instead of against "the way we've always done it" (which, in my studied view, is the second-most dangerous phrase in the aviation industry just after "Watch this!"). With that context as the background, let me proceed to consider specific areas.

THE EFFECTS OF PORNOGRAPHY IN AN AIRLINE COCKPIT

This case revolves in part around the repeated discovery of pornography in airline cockpits, and the effect on those making the discoveries. Of necessity, one of the issues at bar is whether such an occurrence can fairly be considered a safety hazard, or more clearly stated, a matter that degrades or otherwise lessens the margins of safety.

There is a simple equation involved here that the airline industry now understands to be very true: A distracted pilot in any phase of airline operation is less able to perform at the highest levels of awareness and skill application than a non-distracted pilot. In other words, as a rule, a distracted pilot equals a lesser margin of safety than a non-distracted pilot.

This reality was recognized as early as the late 70's by experts within the Federal Aviation Administration when they recommended that a so-called "Sterile Cockpit" rule be adopted and rigorously enforced - a state in which a commercial airline crew would be prohibited from verbally discussing anything not directly related to the safe operation of the aircraft from pushback through ten thousand feet, and from descent through ten thousand until parked at the gate. The reason for this recommendation was simple and compelling: In too many airline accidents, the CVR (cockpit voice recorder) had revealed various forms of ongoing non-pertinent discussions during high-workload phases of departure and arrival that clearly had been contributing factors in the resulting mishap. In subsequent years, violations of the sterile cockpit rule have been contributing factors in at least two major accidents: the aforementioned Lexington/Comair crash; and the loss of a Delta Boeing 727-200 at DFW in 1987.

The second applicable reality is: However it occurs, a distraction in the cockpit reduces the margins of safety.

The third applicable reality is: An upset pilot is a distracted pilot. Despite their best efforts and the clear directives of their companies, human pilots occasionally become sufficiently upset, angry, agitated, frightened, intimidated, or otherwise fixated on a problem or their personal reaction to something upsetting that the result is de facto distraction. Again, we can rail at the pilot all we want about "bucking up" or "having a tougher skin" or even using the old military approach of "that's only a personal problem, lieutenant," but the resulting state of distraction is seldom responsive to such methods, whether such exhortations appeal to the professional machismo of a pilot (male or female), or whether they become a taunt. While pilots as a breed are fairly good at compartmentalizing certain upsets in their personal lives, that skill of compartmentalization varies from individual to individual. But even those who appear to be able to suppress an upset/distraction emanating from their personal life are often fooling themselves, since the underlying upset is still cooking away beneath a facade of normalcy, and the performance distraction is, in other words, still very much present.

So, the shortest route for this reality is that any occurrence that sufficiently upsets, angers, agitates, threatens, or otherwise throws a pilot emotionally off-balance to any significant degree is a distraction that, by its very nature, lessens the margins of safety, regardless of whether it should. For this reason, both public policy and the policy of most enlightened air carriers - as well as the underlying philosophy of the Federal Air Regulations - is to accept this reality and respond to it officially with an unusually sensitive empathy. Even in the absence of a legal requirement to do so, adopting a policy to aggressively minimize events that have a high likelihood of creating a distracted pilot serves the interests of flight safety. This also means an

airline properly positioned to respond to this human vulnerability must welcome in fact and not just in appearance or response the decision of any pilot to remove himself or herself from the flight schedule for any human reaction that could be a significant distraction or otherwise reduce pilot attention and efficiency. Fatigue as well as illness of any degree are clearly included in any list of factors that we do not want in commercial cockpits.

Across the spectrum of U.S. airlines these inescapable realities have led to crew schedulers and pilot managers becoming increasingly aware that forcing, directly or indirectly, an upset (distracted) pilot to fly - or even pressuring such a pilot directly or otherwise - is a de facto dangerous act. Before our collective understanding of the safety import of human factors (in the 1970's, for instance), a pilot calling in to report some major personal problem (such as a major fight with his wife or a major problem with his child) would be greeted with resistance, derision, and abject refusal to consider the personal problem a legitimate reason for stepping down from a flight assignment. Even if such a pilot explained that he was too upset to concentrate, he would likely be warned at most major U.S. carriers that if he didn't go, he'd be in trouble with the company. There was little or no awareness of how dangerous such an exchange could be and the disaster it could contribute to creating in the air. Today, however, the vast majority of crew schedulers are not only trained in, and acutely aware of, this danger area, they tend to be very careful in providing a supportive response without any intimidation, regardless of how much pressure the loss of that pilot has on the operation. Chief pilots also have come to understand that it is far better to err on the side of caution, and that their inherent fear that an individual pilot might misuse such a claim and take advantage of the company is clearly subordinate to the caution that the pilot might actually *not* be fit to fly. Indeed, the correct and safe way to regard a suspected serial user of the opportunity to bow out of a flight due to a human factors problem is to first regard that individual's actions as potentially indicative of a systemic problem (such as a problem with the length or difficulty of a particular sequence of schedule flights) - in other words, a message from the underlying system, rather than a potential disciplinary candidate. The determination of which category such a serially-cancelled pilot falls in can only be determined by careful and sensitive investigation by a qualified individual/s. Yet, it should be noted that the *traditional* method of handling any such perceived misbehavior or even incapacity by a pilot is to spotlight, ostracize, demean, intimidate, or otherwise "correct" the pilot's behavior before showing any official concern about discovering the true source or motivation of the behavior. This traditional method of being spring-loaded to the disciplinary position is rooted in a machismo-based form of Mission Orientation, in which the mission is paramount and individual inconveniences or personal problems are derided as unimportant. In addition to being essentially unfair to the imperfect human and at variance with our contemporary understanding of how to handle a complex human system, it is also self-defeating for the company in that it leads in too many cases to a slippery slope in which the pilot feels increasingly threatened and ostracized while those running the flight department increasingly lose professional confidence in that pilot. The situation, if not rescued by enlightened intervention, too often leads to the permanent loss of an otherwise good crewmember, and the attendant loss of all the training and experience invested in that pilot.

<u>So, against the background of the foregoing, it is clear that a female pilot who is personally affected and upset by the repeated presence of sexually explicit, graphic photos glued or tucked into various places in her working environment (the aircraft cockpit), and the failure of her airline to take appropriate action is a distracted pilot whose performance is by definition</u>

degraded by the presence of such materials, whether they affect anyone else or not. This is a safety issue, and considering the very important fact that the almost perfect level of commercial aviation safety is built on a precarious orchestration of mechanical and human balances and safety values, we cannot allow any degradation whatsoever without risking a decline in overall flight safety. Therefore, the presence of sexually explicit materials in 737 cockpits in this case presented a safety issue, and since ANY safety issue must be taken seriously, this was a serious matter - especially if not addressed by the company over time.

OBLIGATION/DUTY OF CAPTAIN IN PREFLIGHT CHECK REGARDING SEXUALLY EXPLICIT MATERIALS

Sexually explicit materials clearly have no place in a commercial airline cockpit regardless of who might sit in the pilot's seat. Public policy, the airline's own policy, and federal law among other influences require an airline company operating with the public trust as an air carrier under Part 121 of the FAR's to keep the workplace free of offensive materials, and in this use, sexually explicit materials may be presumed to be offensive to any employee who might enter such a cockpit. The duty to keep such a cockpit free of such materials, then, falls not only on the company, but all who represent the company as employees in any capacity of control or responsibility. Pilots, and specifically captains, clearly shoulder great responsibility for their companies, and every major airline's rules and regulations internally address at least to some degree the fact that the personal decorum and conduct of a pilot can be grounds for disciplinary action or even dismissal because the conduct of such a flight officer reflects directly on the airline, and the public's perception thereof. Thus, any captain entering a cockpit and running through preflight duties who finds something clearly (1) Not normally aboard, and (2) Clearly unacceptable as a matter of company policy, has a duty to remove it. Every pilot, whether captain or first officer/copilot, has a specific sequence of "flows" to execute in setting up the switches and instruments before starting the checklist procedures, and these "flows" all contemplate checking the oxygen masks, opening escape rope panels, and otherwise making sure that the cockpit is set up the same way every time. While pilots do not subtract steps from such flows, adding steps - especially as far as opening panels such as ashtrays and former ashtrays - is a standard practice, and promotes full preparation of that side of the cockpit. When a Captain, who is in charge, discovers only a single instance of inappropriate sexually explicit material in a cockpit setup "flow," that captain may fairly presume that other such materials may have been secreted in the area. In fact, most pilots who have encountered materials in one place in a cockpit are quite familiar with finding that it has been spread around numerous locations. If that captain is sufficiently experienced in that aircraft to know that there are other compartments not normally opened during preflight flow but easily accessible and that those compartments may be stuffed with, lined with, or otherwise be hiding sexually explicit materials, that captain has a duty even in the absence of a specific written requirement to at least insure that more of the same isn't there. When a captain knows that his or her airline is strident and inflexible in their policy of zero tolerance, that captain, as the company's representative, has the responsibility to never take the discovery of such materials lightly. Further, since this is without question a potential flight safety issue based on distraction arising from the negative reactions of other fellow pilots who might later find the same things, a captain is honor-bound to take extra steps to assure the cockpit

is clean of such material.

Finding a coat a previous pilot left aboard or some other innocuous item would not require a writeup in the maintenance log. But finding sexually explicit materials that are strictly forbidden by company policy, and with the requirement to understand that such materials may form a safety of flight problem if discovered by other pilots in the course of their duty, reasonably requires at least documentation of the discovery, even in the absence of a specific company procedure to do so. Since sexually explicit materials found in a cockpit degrade flight safety, using the maintenance log to memorialize and report the unacceptable state of the aircraft is a completely legitimate use of the log, even if not contemplated or required by the company. When a discrepancy in the readiness of an aircraft has been entered in the log, it is appropriate and, in fact, expected that a maintenance employee with appropriate authority will correct the problem (remove the material) and "sign off" the log.

The key point here is that the aircraft is not ready to fly with such material aboard, and since any such situation is a serious matter with respect to law, policy, and company policy - and United Air Lines is no exception - the maintenance log is the appropriate medium for documenting and requesting a cleanup of the aircraft.

APPROPRIATENESS OF THE STEPS TAKEN BY UNITED AIR LINES TO "REMEDY" THE PROBLEM OF SEXUALLY EXPLICIT MATERIALS IN UAL 737 COCKPITS

Both licensed pilots and licensed mechanics in commercial aviation are, by nature, highly responsible people. But as with any personnel division in any industry, they have developed certain expectations and understandings about what is meant in the constant flow of informational, directive, and urgent communications from their companies. While many procedures or requested actions are intended to be voluntary, those actions/requirements/directives from the airline that must be followed without question have certain clearly recognizable phrases or "tags" that signal the highest order of directive. United Air Lines, in response to Captain Lisa Stout's complaints and reports in this case, attempted to influence and end the violative behaviors that were resulting in sexually explicit materials appearing repeatedly on 737 flight decks. Never, however, did the communications from the company to the pilot force, or communications from the company to the maintenance employees, include the easy-to-understand language which would have instantly put the perpetrators on notice that their behavior carried the highest level of professional and personal risk. Specifically, each such communication could have and should have included language clearly warning that violation of the stated policy (of not placing such materials or allowing someone else to place such materials in United cockpits) could result in severe disciplinary action up to and including immediate termination.

It is true that pilots often need only be told something is a rule to get them to follow it, while mechanics may need a clearer statement of what will happen if a rule is not followed. In this case, however, the language UAL should have, and did not, use, would have been chilling enough to unequivocally deem the prohibited behavior as an act that could end one's career, whether pilot or mechanic (or, for that matter, flight attendant or cleaner). For pilots in particular, the use of the word "termination" - especially with the word "immediate" attached - is all that's needed to cause all but the most foolhardy pilot to stop whatever the company is

ordering stopped. For mechanics, the message is equally clear, and when accompanied by clear statements that anyone condoning, supporting, or having knowledge of and failing to report such prohibited behavior will (not could) be fired immediately makes the point irrefutably.

In this case, the watered-down enote to the pilots carried no sense of urgency, and worse, no clear indication just what "inappropriate materials" meant. The effect of the overly cautious re-wording of this enote, and primarily the refusal of the company to use the strongest of language and clearly state that placing, or finding and failing to remove sexually explicit materials could result in severe disciplinary action up to and including termination, rendered this note ineffectual. Line pilots receive endless memos, and an enote with such tepid language is not only easy to overlook, but gives the impression that United is interested in cockpits free of "inappropriate materials" only as a matter of request. This did not rise to the level of an order, and as such, fell far short of a company reaction unequivocally designed to address the problem. Policy statements versus directives do not work for the mechanics as well, and the fact that no unequivocal directive using the appropriate language threatening immediate discipline up to and including termination for violation was issued to the mechanics for months does not indicate even a secondary level of company concern. Again, policy statements versus directives are very easy to tell apart, and what was eventually issued to the mechanics would be considered by any commercial airline mechanic at worst a tepid statement of desired policy.

What United Air Lines could have done if they were truly alarmed at the frequence of sexually explicit materials appearing in their cockpits are at minimum the following steps:

1. *United could have issued clear directives to ALL personnel having access to United cockpits (pilots, flight attendants, cleaners, mechanics, etc.) that placing, condoning, failing to remove and report, or permitting another to place such materials would result in discipline up to and including termination.*

Such messages should have been repeated with increasing urgency with each new discovery. The sarcastic and joking references in several maintenance writeups and signoffs indicated that at least some maintenance personnel did not view the problem of smut in the cockpits as a serious matter, nor did they believe there were consequences for failing to take it seriously because their company had not used the clearly understood linguistic methods of communicating its seriousness.

2. *A baseline "sweep" of all 737's awaiting departure overnight at one of United's hubs should have been accomplished.*

On any given day, this inspection could have been carried out with less than an additional 10 minutes per aircraft of work by a mechanic who would be required to document the inspection and sign it off, with his or her license as well as job at peril if the prohibited materials were found later in the day. Such inspections could have detailed specifically which panels to check, and should have warned each "inspector" that one or more "test" insertions would be made to ensure 100% compliance (in other words, if you signed off a test airplane but you didn't find the materials we planted or report it, you're in trouble). More specifically, such a serious inspection would have had the effect of cleansing those particular cockpits and providing baseline information on what percentage of aircraft had such materials aboard, as well as echo

through the ranks of the mechanics the message that United was dead serious about this issue and that not taking it seriously could get you disciplined or fired.

3. *Those managers who were unfamilar with how to mount appropriate and properly forceful directives responding to Captain Stout's reports should have sought immediate help from higher corporate levels, and taken the responsibility to make sure that United, as a company, responded with force and determination.*

Those individuals in United HR and flight manager/chief pilot positions who appear to have been extremely unfamiliar with both the problem of sexually explicit materials in cockpits and the very real impact on flight safety of the attendant potential pilot reactions, also seemed unfamiliar with the correct procedures to aggressively and affirmatively address such an issue. That lack of immediate knowledge about what to do should have led them to seek help from the highest levels of the flight operations division and the HR division of the corporation, and should have triggered an immediate and serious corporate-level response to support and guide them. The lack of such a response from the corporation indicates a weak commitment at best to the stated policy of keeping the workplace free of hostility. Such immediate help should have included human factors/human performance expertise, even if brought in from outside. This was, after all, a very serious matter in terms of safety and legality, and yet it was clearly treated like an insignificant operational difficulty at best, and at worst like a suspect complaint from a pilot who had irritated the command structure. The company response systemically constituted a failed methodology that further setup Wallitner, Durgan, and Hinkle, and aided their mistake in essentially treating the matter as minor and, eventually, as a closed issue when it was anything but that. In addition, it triggered a form of lateral violence between the supervisory pilots and Captain Stout by attacking the reporter when she refused to stop documenting a problem they obviously felt incapable of remedying. Had United's managers treated this with the extreme seriousness it deserved, even in the absence of specific support and reassurance for Captain Stout, their actions would have substantially proven the company's intolerance to smut in the cockpits. Attacking or abandoning a reporter is precisely this type of behavior that served to suppress crewmembers' willingness to report serious safety shortcomings in airlines for so many decades prior to the eighties.

4. *United as a company should have signaled clearly that it would not give up until the problem was remedied in full, and that this was NOT a routine matter.*

Hinkle and Wallitner clearly gave up far too quickly in not only trying to end the presence of sexually explicit materials in the cockpit, but they gave up as well in trying to establish that this problem was, in fact, a serious one that merited a heavy-handed corporate response. They were, in effect, left out in the cold by a thoroughly inadequate and disinterested corporate response and lack of support. Properly experienced and supported flight managers/base chief pilots would never let an issue as serious as this simply become a paperwork exercise.

5. *The company at all levels could have made the message unmistakable that this practice must end.*

However, Ms. Hinkle in particular, in her apparent lack of understanding of how to effectively communicate serious directives to pilots and mechanics, failed to seize the opportunity to place United as a company unequivocally on the record in refusing to tolerate what was happening. The negative message of such a tepid response actually serves to turn a blind eye to the offending conduct, reassuring the perpetrators that catching or stopping them is of insufficient interest to the company to be a threat. The enotes sent to the pilots and notice sent to the mechanics, and the utter absence of a corporate-wide serious response essentially endorsed the conduct, much as happened at both Pan American and Eastern Airlines in the 1980's.

6. *United should have aggressively authorized the use of its information technology experts to aid the investigation.*

The failure of Hinkle, Wallitner, Durgan, and United in general to make it a priority to use United's extensive computer capabilities and database to track the 737 fleet and document the occurrences of such writeups (for smut in the cockpit) underlines the lack of seriousness with which Captain's Stout's complaints were regarded corporately. In fact, it is fairly simple and inexpensive to use keyword searches in any modern database to discover maintenance writeups fleetwide or companywide that could illustrate the extent of the problem, and thus form a baseline of data against which remedies could be tested. Such a data tracking exercise, when done in conjunction with simple research on the fleet routing history of each aircraft, might have illuminated a particular base that appeared to generate more complaints, or generate more insertion of the sexual materials in cockpits. They failed to even access or review the maintenance logs of the 737 fleet to obtain information which could be used to help in stopping the placement of pornography in the cockpits, although the logging of such incidents was mandatory and would have given notice to United of the reports.

7. *United should have immediately and consistently taken the stance that the reporting pilot must be protected and supported.*

The failure to support Captain Stout, and in fact the clear move from energetic and correct response to her report to effectively attacking the reporter and questioning her abilities and motivations is a classic example of horizontal hostility, and very, very dangerous to flight safety. No matter how maverick a pilot, when treated with this level of negligent contempt after a legitimate report, the message sent to all other pilots is a caution not to step too far out of line, even in defense of safety. Clearly, United failed to recall the very basic lessons of the Renaissance it helped spark in the eighties through Cockpit/Command Leadership Resource Management. And even if the flight managers had concluded that Captain Stout's actions in either reacting to cockpit smut or reporting it were improper or excessive, the proper and safe reaction would have been to work with her, not to find a way to expel her into medical retirement, but to understand and incorporate the lessons learned and how they needed to do a better job of supporting a reporter in the future. In other words, despite the fact that United's public policy as of the 90's had been to treat their pilots humanely and intelligently with respect to problems with their performance, and to comply with discrimination laws and policies, in this case their actions reverted to the old school of "conform or die." Since, after their ineffectual

attempts to remove the smut from the cockpits it was apparent that her further report and documentation of each instance was an unwelcome irritant - and her personal anxiety of no interest to the company - United's actions seem to suggest that what she should have done was simply shut up and deny her own reactions. United knows and is charged with knowing that this is a dangerous corporate methodology when it comes to human pilots, because it tends to return to the earlier age of demanding that pilots suppress feelings that could make them less than safe. While there is no indication that Captain Stout was less than safe, her actions in removing herself from what was clearly a non-supportive environment was prudent and the responsible thing to do in the interests of air safety.

8. *An airline captain faced with hostility from management, clear lack of trust, or an otherwise non-supportive, suspicious environment is at substantial risk in continuing to serve as a pilot in command.*

Airline captains today are tightly constrained in terms of the decisions they make on the job, but there are still literally dozens of significant decisions per flight that if wrong, and even if not at variance with the rules of FAR's, could still cause that captain's actions and decisions to be seriously questioned. The decision given the facts he or she has at the time, for instance, to abandon an approach and proceed to an alternate destination may be questioned by passengers, or flight dispatch, and while routine questions may not be threatening, what buttresses both the individual performance and decisional authority of each captain is the knowledge that his or her chief pilot will back them up as long as the criteria they have used for decision-making is reasonable. In other words, a fellow pilot, even in a managerial position, must be relied on to support his or her line captains even when decisions were perhaps of less quality than desired, or that chief pilot will be nurturing a sullen, uncommunicative, and suspicious pilot force that will tend to "work to rule" to protect themselves even when their better judgment and safety would have been better served by strong, independent decisions. This is a delicate line, and many chief pilots fail by being too Draconian or rigid. Others fail by sending the message that their captains can be mavericks. Good judgment, we now know, is about 80% of flight safety, and good judgment in the airline business requires confident captains. When a captain has been treated as Captain Stout was in this case, she not only cannot be confident, she would equally be negligent not to understand that virtually ANY decision, however well thought out, will likely be subject to questioning with a hostile bias. In other words, the same operational decision that would have netted her nothing worse than a casual inquiry from the chief pilot in a non-hostile, or trustful captain-chief pilot relationship, in the type of distrustful, hostile environment she was presented with could be expected to generate a frightening round of questioning and a presumption of disapproval. And, if an unfortunate event occurs that results in damage to an airplane or worse, an unsupported captain knows without question that there will be an immediate presupposition that something he or she did was wrong and causative, and that presupposition is highly likely to fatally prejudice any investigation. Therefore, what United's pilot management did in spotlighting Captain Stout and essentially attacking her was to send the distinct and unequivocal message that she could expect no benefit of the doubt in any future encounter, and that, worse, the pilot leadership was ready to assume that if a problem occurred in the future, it was more than likely a result of her presence as the pilot in command. Continuing to fly in such an environment is both a tremendous professional and personal risk, as well as a degrading of flight

safety, in that it constitutes a major distraction. The writer has personally witnessed senior captains at two airlines responding to such a hostile environment with exaggerated actions and reactions designed to either avoid tough decisions or refuse to make any critical decisions despite being in command. Both reactions can degrade and compromise flight safety.

9. *United should have demonstrated a clear, operational understanding of the fact that any actions toward one pilot will be watched and discussed and reacted to by all other pilots in the company*

United's pointed abandonment of Captain Stout following their refusal to do the appropriate things to remedy the problem that was increasingly impacting her serves to send a dangerous chill through any other captain who would have the temerity to continue to press the company to fix a problem they are unwilling to fix, whatever that problem might be. While pilots should not be encouraged to hold their company "hostage" to just any perceived defect they want corrected, the responsibility of a major airline to use a higher, more enlightened level of understanding of the inevitable human reactions that result when a reporter is attacked or abandoned - or spotlighted - rises to the highest level of public duty. United, as one of the pioneers of these very understandings, has the greatest duty imaginable not to forget them in practice, as they clearly did in this instance. The way Captain Stout was treated intimidates the pilot force, whether that was United's intention or not.

A PILOT'S RESPONSIBILITY FOR REMOVING HIMSELF/HERSELF FROM FLYING WHEN PHYSIOLOGICAL OR PSYCHOLOGICAL IMPAIRMENTS EXIST.

The federally-issued license to fly an aircraft is a privilege, not a right, and as such it carries great responsibility. The license to fly as an Airline Transport Pilot, the specific rating required to be a captain on a Part 121 flight, carries an even more immense public responsibility, considering the large scope of potential public harm that can result from unameliorated human mistakes. As we have transitioned from the swashbuckling attitudes of machismo and mission-oriented expectation that strong pilots can fly perfectly well sick, distracted, drunk, or otherwise impaired, we have come to realize that our public trust absolutely includes self-policing for any problem known only to us that could compromise the safety of flight and the safety of our passengers. First and foremost are the universal rules and our expected adherence to them prohibiting alcohol or drugs - even prescriptive in most cases - in our bloodstreams while serving as an airline pilot. But over the past thirty years we have also grudgingly come to realize that the list of potentially dangerous impairments include fatigue, cumulative fatigue, distraction (as discussed) from any substantial source, sickness even to a fairly minor degree if it's distracting (such as a difficult head cold), and even an area of potential impairment a prior age of pilots would have considered dishonorable: emotional upset, including depression. While the duty of an airline captain to be frank and honest in reporting an impairment, and removing himself or herself from a trip is paramount, the duty of the airline to support such decisions is also a massive public trust. Along with that comes the airline's responsibility to do far more than just passive diligence in seeking to discover *why* a particular pilot might seem to be overusing sick days, sick leave, or trip removal for fatigue. While United was within their statutory rights in

making a subjective decision to dock Captain Stout or any other pilot for being unready to fly due to a presumption of failure to properly prepare herself with a sleep schedule (or any other reason purported to be the pilot's fault), the reality in this case is that the action taken against her was wholly disciplinary and reactionary. Nowhere in the sequence of what occurred is there any indication that Captain Durgan, or anyone else, sought first to determine whether that trip removal resulted from a company-triggered problem - which it appears to have been - or from personal negligence. That failure to inquire simply goes hand in hand with the obvious and dangerous decision-by-default to abandon the reporter and strike back at her for having the effrontery to continue pointing out a major shortcoming: that United did not put sufficient effort into curing the smut in the cockpit problems, and apparently, as a corporation, failed despite its statements of policy to the contrary because operationally it did not consider the matter of sufficient significance. Thus, this instance of docking a pilot for removing herself from a trip was retaliatory and disciplinary, and will have been viewed as such by any other pilots. As such, this action constitutes a negative warning to other pilots to be careful in removing themselves from flying when they feel impaired, because to do so may be initially labeled a negligent act. Certainly that message would not be sent if a pilot has a clear track record of baseless use of the privilege to get off a flight for fatigue, but here the company attacked the act without demonstrating interest in the underlying cause, and did so with such rapidity that despite their clear previous "spotlighting" of Captain Stout, other line pilots would consider it somewhere between a cautionary tale and a clear threat.

The final indication that United's flight managers had turned on Captain Stout in a form of horizontal/lateral violence associated with frustration over her having reported and her refusal to stop highlighting practices which they had failed to stop was the Letter of Counsel. For an airline pilot whose entire career hangs by the threads of continuous medical qualification and continuing ability to pass constant checkrides and scrutiny for proficiency, virtually ANYTHING inserted in their pilot personnel file is considered a direct and serious threat to their career. Worse, all airline pilots who are members of pilot unions clearly understand that the preliminary steps a company takes when they are building a record to use to support a future dismissal is to start inserting various items in the pilot's file. A Letter of Counsel may be considered by a flight manager to be a benign situation, but in the eyes of the pilot, the only reason for inserting such a thing in his or her record is to begin the dismissal process and seed the record well enough to survive the inevitable union challenge. Giving a Letter of Counsel and considering it a non-event that the pilot should not react to negatively, however, is either unforgivably naive for a flight manager or chief pilot, or purposefully misleading. If that flight manager has been a line pilot - and most have - there is no efficacy to the assertion that the Letter was an insignificant event. The Letter of Counsel given to Captain Stout, in other words, was properly considered a documentation of her company's loss of confidence and withdrawal of support, and an indication of their desire to see her leave by whatever means. This conclusion is in no way excessive or unsupported, even if it was not what the writer of the letter truly meant. The effect of such a letter on any balanced, thinking individual with pride in their professionalism ranks somewhere between unnerving and devastating, and clearly becomes a major distraction and a major threat. In other words, such instruments must be used with great care because the very issuance of such a letter and the placement in a pilot's file impacts the ability of that pilot to perform at the highest levels.

In conclusion, the facts of this case regarding the way United inadequately responded to Captain Stout's obviously legitimate reports describes a systemic problem that is doubly sad when one recalls that United helped to establish an entirely different course of industry action standard involving sensitive human and humane responses as a matter of safety. United institutionally, in other words, knows better, and had a responsibility to end the illicit actions (smut in the cockpits) that at least a few of their pilots found offensive by strong, continuous, determined and crystal clear directives, and they had a duty based on safety of flight to refrain from sending a chill into the rest of the pilot force by attacking the reporter by various means when they had failed themselves to rectify the subject of the continuous reports.

I retain the right to add to or amend this report as other information may be provided.

John J. Nance

# DOCUMENT PRODUCTION LIST

*Stout v. United Air Lines, Inc.*

John J. Nance
2542 Westlake Avenue North, Suite 8
Seattle, WA 98109
(253) 606-9266

DOCUMENTS PROVIDED:

| [illegible] | [illegible] | DESCRIPTION |
|---|---|---|
| 1 | 10/12/07<br>08/22/08 | Complaint for Damages |
| 2 | 10/29/07 | Stipulated Protective Order |
| 3 | 08/20/08<br>08/22/08 | Chart re: Supplemental Answer to Interrogatory No. 2 (listing of all places that porn was found) |
| 4 | 08/20/08<br>08/22/08 | UAL Maintenance Log Entries (UAL 000603 - 608) |
| 5 | 08/20/08<br>08/22/08 | Sebby email re: inappropriate materials in cockpit (STOUT 131) |
| 6 | 08/20/08 | E-Note for All Line Mechanics re: inappropriate materials in cockpit (UAL 000481) |
| 7 | 08/20/08<br>08/22/08 | UAL Maintenance Log Entries - Fleets Other Than 737 (UAL001897 - 1901) |
| 8 | 08/20/08 | Statement of Facts from GTH |
| 9 | 08/20/08 | List of questions seeking his opinions, and information from GTH |
| 10 | 08/22/08 | Lisa Stout deposition transcript |
| 11 | 08/22/08 | Examples of porn found by Stout (STOUT 353, 355) |
| 12 | 08/22/08 | Supervisor's Packet Responding to a Claim of [Sexual] Harassment or Discrimination (UAL 000448 - 476) |
| 13 | 08/22/08 | Sheryl Hinkle deposition transcript (volumes I-II) |
| 14 | 08/22/08 | Ulrika Wallitner deposition transcript |
| 15 | 08/22/08 | Patrick Durgan deposition transcripts (volumes I-II) |



ATTACHMENT A

| | DATE | DESCRIPTION |
|---|---|---|
| 16 | 08/22/08 | Mark Sebby deposition transcript |
| 17 | 08/22/08 | Closure letter to Stout, 8/17/04 (STOUT 130) |
| 18 | 08/22/08 | UAL documents re: Violence in Workplace Report, 12/2004 (UAL-001902 - 1932) |
| 19 | 08/22/08 | Wallitner email, 9/9/04 (UAL-001731) |
| 20 | 08/22/08 | Wallitner email, 9/17/04 (UAL-001732) |
| 21 | 08/22/08 | Letter of Counsel, 6/9/05 (STOUT 184) |

# JOHN J. NANCE

*CURRICULUM VITAE*
(Current as of 2006)

## *EDUCATION*

**Juris Doctor** - Southern Methodist University Law School, December, 1969.
(Admitted to practice law before the State Bar of Texas, May, 1970.)
**Bachelor of Arts** - Southern Methodist University, May, 1968.

o Graduated with Honors, St. Mark's School of Texas (Dallas), College Preparatory, 1964.
o *Distinguished Graduate*, United States Air Force Undergraduate Pilot Training, Williams Air Force Base, Arizona, Class 71-08, June, 1971.
o *Distinguished Alumnus Award*, 2002, Southern Methodist University

## *PROFESSIONAL EXPERIENCE IN BRIEF* *(Underlined Dates indicate Positions Currently Held)*

| | |
|---|---|
| 2006 | Author, **ORBIT**, (Simon and Schuster, 2006) |
| 2005 | Author, **SAVING CASCADIA**, (Simon and Schuster, 2005) |
| 2003 | Author, **GOLDEN BOY**, (Eiken Press, 2003) |
| 2003 | Author, **FIRE FLIGHT**, (Simon and Schuster, 2003) |
| 2003 | Author, **SKYHOOK**, (Putnam, 2003) |
| 2002 | Named **Distinguished Graduate**, Southern Methodist University, Dallas |
| 2002 | Author, **TURBULENCE**, (Putnam, 2002) |
| 2001 | Author, **HEADWIND**, (Putnam, 2001). |
| 1999 - 2004 | Executive Committee of the Board of Directors, National Patient Safety Foundation. |
| 1999 | Author, **BLACKOUT**, (Putnam, 2000). Scheduled for release in February, 2000. |
| 1998 | Author, **THE LAST HOSTAGE**, (Doubleday, New York, 1998) |
| 1997- | Partner in the Austin TX law firm of Nance & Carmichael, PC. |
| 1997- 2006 | Board of Directors, NPSF (National Patient Safety Foundation), AMA |
| 1997 | Creator, technical advisor, actor--ABC Mini-Series **MEDUSA=S CHILD**, A two-part mini-series aired fall 1997) |
| 1997 | Author, **MEDUSA=S CHILD**, (Doubleday, New York, 1996) |
| 1997-2007 | Who=s Who in America, Who=s Who in American Law, Who=s Who in the World. |
| 1996 | Creator, technical advisor, actor--NBC Mini-Series, **PANDORA=S CLOCK**, November 10-11, 1996, (Highest rated mini-series in nine years) |
| 1995 | Release of **PANDORA=S CLOCK** in paperback, (St. Martin=s Press), New York Times bestseller |
| 1995- | **AVIATION EDITOR, GOOD MORNING AMERICA.** |
| 1994- | **AVIATION ANALYST for the ABC Radio and Television Network.** |
| 1994-1995 | ABC World News Tonight consultant (re: the loss of U.S. Air |



ATTACHMENT B

| | |
|---|---|
| | Flight 427/Pittsburgh) |
| 1995 | Author, **PANDORA'S CLOCK**, (Doubleday, New York, 1995). |
| 1994 | Admitted to practice before the United State Federal Court of Appeals, Washington, D.C. |
| 1993-1995 | Individual Mobilization Augmentee (IMA), Lt. Colonel, assigned to Headquarters, AETC, Randolph AFB, Texas - involved in Air Force wide Crew Resource Management (CRM) education, and writer/producer/director of CRM-related videotape productions. |
| 1993 | Author, **PHOENIX RISING**, (Crown Publishing, New York, released in Spring, 1994) |
| 1992 | Author, **SCORPION STRIKE**, (Crown Publishing, New York, Spring, 1992) |
| 1991 | Author, **WHAT GOES UP**, (Wm. Morrow, New York, Summer 1991) |
| 1990 | Author, **FINAL APPROACH**, (Crown Publishing, New York, Summer 1990) |
| 1989 | Contributing Author, **TRANSPORTATION SAFETY IN AN AGE OF DEREGULATION**, (Oxford Univ. Press, London, 1989) |
| 1988-1993 | Project Officer, Cockpit Resource Management and Aircrew Flight Safety Program Development and Education, 97th MASq, U.S.A.F.R. Assoc. |
| 1988 | Author, **ON SHAKY GROUND**, (Wm. Morrow, NY, 1988). |
| 1987-1989 | Board Member, Foundation for Issues Resolution in Science and Technology. |
| 1987 | Consultant, Congressional Office of Technology Assessment, Special Project on Airline Deregulation's Effect on Safety. |
| 1987-1993 | *Professional Leave Status,* Airline Pilot, Alaska Airlines. |
| 1986 | Author, **BLIND TRUST**, (Wm. Morrow, New York, 1986). |
| 1986-present | Airline Safety Analyst/Consultant. EMEX Corporation. |
| 1985-Present | Airline Pilot (**Captain, Boeing 737-400**), Alaska Airlines. |
| 1985-1992 | Pilot Training Consultant/Instructor, Simulator Training Incorporated. |
| 1985-present | Professional Speaker |
| 1984 | Author, **SPLASH OF COLORS**, (Morrow, New York, 1984) |
| 1983-1988 | Vice-President-Development, Preventative Products Incorporated. |
| 1979-1986 | President, CEO, Executive Transport Incorporated. |
| 1975-1982 | Airline Pilot, Braniff International Airlines. |
| 1975-1993 | Aircraft Commander, C-141B, United States Air Force Associate Reserve; Rank: Lieutenant Colonel. |
| 1973-1975 | Intelligence Briefing Officer, 62nd Wing Staff, McChord AFB. |
| 1973 | Project Chief, Operation Third Lieutenant, U.S. Air Force. McChord AFB, WA |
| 1970-1975 | U.S. Air Force Officer/Pilot; Aircraft Commander, C-141 A/B; Rank: Captain. |

| | |
|---|---|
| 1971-1973 | Radio Newsman (Part time), KTAC-AM, Tacoma, Washington. |
| 1971 | **Distinguished Graduate**, U.S. Air Force Undergraduate Pilot Training. |
| 1970-present | Attorney, Admitted to Texas Bar; Private Practice (Limited), Dallas, Texas. |
| 1969 | **J.D.** (Air Law) Southern Methodist Law School, Accelerated 3/3 Program. |
| 1969-1970 | News Director, NEWSCOM News Service, Dallas, Texas. |
| 1968 | Commissioned Second Lieutenant, U.S. Air Force (ROTC Program) |
| 1968 | **B.A.** (Law) Southern Methodist University |
| 1966-1970 | Radio/Television Newsman, WFAA-AM-FM-TV, Dallas, Texas. |
| 1964-1965 | Announcer/Newsman, KAIM-AM/FM, Honolulu, Hawaii. |
| 1957-1964 | Writer, columnist, aviation writer, Park Cities North Dallas News. |

## PROFESSIONAL EXPERIENCE

### PROFESSIONAL PILOT

1993-1996 Individual Mobilization Augmentee (Lt. Colonel) Assigned to Headquarters, Air Education and Training Command, Randolph AFB, TX. Producer/writer/director/on-camera for various video productions in support of Crew Resource Management for the U.S.Air Force.

1988-1993 Project Officer, Cockpit Resource Management and Aircrew Flight Safety Program Development and Education, utilized throughout the U.S. Air Force (MAC, ATC, SAC, TAC, USAFE, and USAFR), based at 97th MASq, McChord AFB, WA.

1985-2003 Alaska Airlines (Seattle): Pilot/Captain, Boeing 737-400. (Was on leave to pursue safety projects from 1987-1993. Called to active USAF duty for Operations Desert Shield/Storm during 1990-1991). Early retired, February 1, 2003.

1984-1989 Boeing 727 Simulator Instructor (supplemental, on call), Simulator Training Incorporated, Seattle, WA.

1975-1993 C-141B Aircraft Commander, U.S. Air Force Reserve, 97th Military Airlift Squadron, McChord Air Force Base, Washington: Military Airlift Command Associate Reserve, Rank: Lieutenant

Colonel.

1975-1982 Braniff International Airlines: Pilot, Boeing 727, 747, and Douglas DC-8, domestic, Asian, European, and South American service.

1971-1975 C-141A and C-141B Aircraft Commander, U.S. Air Force, 4th Military Airlift Squadron, McChord Air Force Base, Washington: Military Airlift Command.
Total Pilot Time: 13,000 hours plus.

## AVIATION SAFETY CONSULTANT

1995-Present Aviation Safety Consultant to the legal profession nationwide.

2002 Keynote Speaker, *Safeskies* Conference, Chartered Institute of Transport (Australia) Aviation Safety National Conference, Canberra, ACT, Australia, October, 2002.

1998 Keynote Speaker, *Safeskies* Conference, Chartered Institute of Transport (Australia) Aviation Safety National Conference, Canberra, ACT, Australia, October, 1998.

1995 Keynote Speaker, International Aviation Psychology Symposium, Columbus, Ohio.

1986-Present Airline Safety Analyst/Consultant, PHOENIX PARTNERS, Ltd., Tacoma, WA.

1993 Keynote Speaker, Chartered Institute of Transport (Australia) Aviation Safety National Conference, Canberra, ACT, Australia, October, 1993.

1991 Keynote Speaker, International Aviation Psychology Symposium, Columbus, Ohio.

1990 Keynote Speaker, U.S. Air Force Worldwide Safety Conference Norton AFB, CA, November; Presenter on Human Factors and CRM: Air Training Command Safety Conference, San Antonio, Texas; Presenter on Human Factors and CRM: Tactical Air Command, Langley AFB, VA; Presenter on Human Factors and CRM: MAC Safety Conference, Scott AFB, IL.; Keynote on Human Factors and CRM: Air Force Reserve Safety Conference, Tucson, AZ.

1990 Consultant/Co-Facilitator and Lecturer, the *Professional Airmanship* course presentations of Northwest Air Training Corporation Extension Services.

- o Corporate Seminar, Calgary, Canada, November, 1989.
- o British West Indies Airlines (Trinidad and Tabago Airline Co. Ltd.), March, 1990.

1989 Contributing Author, **TRANSPORTATION SAFETY IN AN AGE OF DEREGULATION**, (Oxford Univ. Press, London, 1989).

| | |
|---|---|
| 1989 | Keynote (*Paper Presented*), Flight Safety Foundation Annual Corporate Flight Safety Seminar, Detroit, Michigan. |
| 1989 | Consultant, Northwest Airlines Flight Department, Cockpit Resource Management Project (Single Presentation). |
| 1988 | Keynote (*Paper Presented*), U.S. Air Force Reserve Safety Conference, San Bernardino, California. |
| 1988 | USAF Safety and Inspection Center, Norton AFB, CA - Co-Author of a motion picture production on C-141 flight safety, Breaking the Circle. |
| 1987 | Consultant and On-Camera Presentation, WHY PLANES CRASH, NOVA (PBS), produced by Veronica Young. This production has become a training standard for CRM courses worldwide. |
| 1987 | Consultant, Airline Deregulation and Safety Research Project, United States Congress Office of Technology Assessment. |
| 1987 | Principal Speaker (*Paper Presented*), Transportation Deregulation and Safety Conference of Northwestern University's Transportation Center. |
| 1987 | Consultant to Canadian Union of Public Employees, Ottawa, regarding Canadian Airline Deregulation bills C-18 and C-19. |
| 1984-1992 | Pilot Training Consultant: Course Preparation, FAA Required Manuals/Course Construction, Classroom Presentation and development, STI. |

o Consultant/Analyst used by the following news media on matters of aviation safety and earthquake safety:

(Mr. Nance has appeared on thousands of radio and television shows since 1985 in his capacity as an aviation safety analyst.)

**Client Networks/Media Outlets Include:**

ABC Television Network Aerospace Analyst – (Under Exclusive Contract since 1994)
NBC Television Network
CBS Television Network
Turner Broadcasting System - Cable News Network
Public Broadcasting System
ABC Radio News
NBC Radio News
CBS Radio News
National Public Radio
Mutual Radio Network
Associated Press Audio
USA Today
Los Angeles Times
UPI
Associated Press

BBC (London)
CBC (Canada)
Australian Broadcasting Company

## TESTIMONY TO ELECTED BODIES

1989-1990 Numerous appearances to testify on seismic/earthquake safety before state legislative committees in the states of Oregon and Washington.

Oct.28,'87 Subcommittee on Rural Economy and Family Farming of the Committee on Small Business of the United States Senate, testimony regarding: *The Effect of Airline Deregulation on the Rural Economy.*

Mar.16,'87 CANADA: *Before the* Standing Committee on Transport of the House of Commons of Canada, Thirty-Third Parliament, testimony regarding: *Bills C-18 and C-19, respecting deregulation of Canadian transportation systems.*

May, '86 New York State Senate Committee on Transportation, testimony regarding: *The effect of National Deregulation on New York City.*

Feb.5,'86 Investigations Subcommittee of the Committee on Armed Services, U.S.House of Representatives, Testimony regarding: *Safety of Aircraft Under Charter to the Department of Defense.*

## AUTHOR/WRITER

-Numerous writing credits 1970-1997 nationally.
-Regular contributor to: Los Angeles Times Editorial Page
Los Angeles Times Syndicate
USA Today
San Francisco Chronicle
Professional Pilot Magazine
-Columnist, Braniff Inflight Magazine, 1987-1989.

-Author of: **SPLASH OF COLORS**, (Wm. Morrow, 1984).
**BLIND TRUST**, (Wm. Morrow, 1986)
**ON SHAKY GROUND**, (Wm. Morrow, 1988).

**FINAL APPROACH**, (Novel-Crown Publishing/1990)
**WHAT GOES UP**, (Wm. Morrow, 1991).
**SCORPION STRIKE**, (Novel-Crown Publishing/1992)
**PHOENIX RISING**, (Novel-Crown Publishing/1994)
**PANDORA'S CLOCK**, (Doubleday, Aug, 1995)
**MEDUSA'S CHILD**, (Doubleday, Feb. 1997)
**THE LAST HOSTAGE**, (Doubleday, Feb. 1998)
**BLACKOUT**, (Putnam, Feb. 2000)

**Law Review Article** with Charles David Thompson, "The Pilot Records Improvement Act of 1996:Unintended Consequences," Journal of Air Law and Commerce, Southern Methodist University School of Law (Summer 2001).

**HEADWIND**, (Putnam, Feb. 2001)

**Denial of Access,** Special Edition, Commerce Clearing House, 2001, regarding the congressional and federal steps needed to avoid a repeat of the 9/11 hijackings.

**TURBULENCE**, (Putnam, Feb. 2002)

- Contributing Author to: **TRANSPORTATION SAFETY IN AN AGE OF DEREGULATION**, (Oxford Univ. Press, London, 1989).

**SKYHOOK**, (Putnam, Feb. 2003)
**GOLDEN BOY**, (Eiken Press, 2003)
**FIRE FLIGHT**, (Simon and Schuster, 2003)
**SAVING CASCADIA**, (Simon and Schuster, 2005)
**ORBIT**, (Simon and Schuster, 2006)

**AWARDS**

- Pacific Northwest Writers Conference Lifetime Achievement Award, 1996
- Washington's Outstanding Author award for 1987.
- Distinguished Graduate Award, Southern Methodist University, 2002

**PROFESSIONAL SPEAKER/PRESENTER**

-Presenting speeches, seminars, and keynote addresses, nationally and internationally. Subjects: Team Creation and Leadership, Crew Resource Management, Medical/Hospital Teamwork, Medical Center Risk Management Methods, Interactive Communication and Motivation, and Expanded Human Performance Training.

-Represented by **PHOENIX PARTNERS, LTD. (2542 Westlake Ave. N. #8 Seattle, WA 980109)**

**Some 823 major addresses have been delivered on Patient Safety, Industrial Safety and Teamwork, Risk Reduction, and the Lessons from Aviation Safety between 1999 and 2007.**

## Selected Major Presentations to 1999

- Institute for Healthcare Improvement, New Orleans, LA, December, 1999.
- Washington Governor=s Safety Conference, Spokane, 1999.
- Tampa General Hospital: Florida Health Sciences, Tampa, FL, May 21, 1998
- Lake Forest, IL, May 18, 1998
- Princeton Community Hospital, Princeton, W. VA, May 12, 1998
- Washington Health Cancer Risk Management Society, Seattle WA, May 8, 1998
- CRM Conference, Westover AFB, Chicopee MA, May 6, 1998
- AMA/CMA 1998 International Conference on Physician Health, Victoria BC, Canada, April 29-May 2- 1998
- NPSF Regional Meeting-Moderator, Seattle WA, March 24, 1998
- Meridian Medical Center, Marietta GA, March 11, 1998
  Regional Medical Center, Orangeburg SC, March 10, 1998
- SMU Air Law Symposium, Dallas TX, February 26-27, 1998
- Peri-Operative Services, Chicago, IL, February 6, 1998
- Firefighter=s Conference, Mirana AZ, January 26, 1998
- NPSF Medical Meetings, Boston, MA, January 23, 1998
- Increasing Patient Safety and Decreasing Litigation in Perinatal Services C A Team Approach, Miami FL, November 22-23, 1997
- Children=s Hospital Medical Center, Cincinnati OH, November 17, 1997
- MCIC Vermont, Inc.: Claims and Risk Management Committee, Aruba, November 11-13, 1997
- American Society of Healthcare Risk Management, Atlanta, GA, October 27, 1997
- Updates in Risk Management, San Diego CA, October 24, 1997
- OR Managers Meeting, San Diego CA, October 2-3, 1997
- MMI Companies Inc.: Perinatal Medicine C Enhancing Systems to Decrease Liability Exposures, Houston TX, September 22-23, 1997
- MMI Companies Inc.: Today=s OR Suite, Chicago IL, September 11-12, 1997
- MMI National FT Seminar, Chicago IL, August 23, 1997
- Boeing FOD Conference, Seattle WA, June 25, 1997
- Alina Health Care Systems, Keynote Address, Minneapolis MN, May 15-16, 1997
- NW Association of Fire Fighters, Lake Chelan WA, April 15, 1997
- The Post & Courier Presentation, Charleston SC, April 10, 1997
- University of Washington Writing Program, Seattle WA, April, 1997
- Christamore Aid Society, Book & Author Benefit, Indianapolis IN, March 20, 1997
- Western Washington Emergency Network (WWEN), Seattle WA, March 12, 1997
- Washington State Association of Fire Chiefs, Bellevue WA, February 21, 1997
- Society of Flight Test Engineers, Renton WA, January 29,1 997
- Mercer Island Literary Commission, Mercer Island WA, January 21, 1997
- Whidbey Island Naval Air Station, Safety Standdown, Oak Harbor WA, January 15, 1997
- White House Commission on Aviation, Safety and Security, Presenter, Washington DC, January 13-15, 1997
- US Dept. Of Agriculture: Forest Service, Senior Level Aviation Management, Marana AZ, December 8-9, 1996
- American Medical Association: Examining Errors in Health Care, Keynote Speaker, Palm Springs CA,

October 13, 1996

- MMI Companies, Inc., Communication: The Engine of Managing Risk, Oak Brook IL, August 10, 1996
- Lake Forest Hospital: Leadership Forum on Health Care, Lake Forest IL, July 16, 1996
- Huntington Memorial Hospital: Positive Outcomes: The Critical Role of Communication, Pasadena CA, June 3, 1996
- Sutter Community Hospital: Growing With Change, Sacramento CA, May 17, 1996
- Creighton St. Joseph Healthcare System: Communication in the 90's, Omaha NE, May 14, 1996
- Sinai Hospital: The Spirit of Teamwork in Risk Management, Detroit MI, April 3, 1996
- Transport Canada/Aviation: 2nd Maintenance/Ground Crew Errors Conference, Vancouver BC, Canada, January, 1996
- Boulder Community Hospital: Positive Results of Effective Communication, Boulder CO, January 23, 1996
- Arizona Kidney Foundation, Phoenix AZ, October, 1995
- Anesthesia Services Medical Group: Creative Communications, San Diego CA, August 9, 1995
- MMI Companies, Inc.: Mitigating the Risks in Risk Management, Oak Brook IL, August 5, 1995
- Effective CRM in the Hospital Environment, Atlanta GA, July, 1995
- Infection Control Specialists, Las Vegas NV, July, 1995
- American Automobile Association: Annual Convention, San Antonio TX June, 1995
- Eastern New Mexico Medical Center, Roswell NM, January, 1995
- Holland Community Hospital, Holland MI, November, 1994
- Holmes Medical Center, Holmes FL, October, 1994
- Inter-mountain Health Care Systems, Salt Lake City UT, September, 1994
- American Bar Assoc./Admin. Law Div., Panel, New Orleans LA, August, 1994
- Medical Administration Conference, Tallahassee Medical Center, Keynote, Panama City FL, August, 1994
- Federal Executive Institute, Faculty, VA, June, 1994
- Lutheran General Hospital Medical Staff Seminar, Chicago IL, May, 1994
- Oregon Dept. of Forestry, Keynote, Redmond OR, May, 1994
- U.S. Forest Service, Medford OR, March, 1994
- MMI Companies, Inc. - Surgical Risk Management, Keynote, New Orleans LA, March, 1994
- U.S. Forest Service Aviation Safety Conference, Keynote/Faculty, Mirana, AZ, January, 1994
- Chartered Institute of Transport-Australia, Keynote, Canberra ACT, Australia, October, 1993
- British Columbia Aviation Council Ann. Convention, Keynote, Whistler BC, Canada, October 1993
- Trinity University Physiologists Course, San Antonio TX, March, 1993
- FAA Airports Conference, Seattle WA, February, 1993
- USAF Air Mobility Command CRM Conference, Keynote, Scott Air Force Base, IL, February, 1993
- NW Aviation & Trade Fair, Keynote, Annual Fair, Tacoma WA, February, 1993
- Pacific Gas and Electric Safety Division, Annual Seminar, San Francisco CA, January, 1993
- Retired Air Line Pilot's Convention, Annual Convention, Sarasota FL, October, 1992
- International NW Aviation Council, Keynote, Annual Convention, Edmonton AL, Canada, August, 1992
- Pacific Gas and Electric, Customer Appreciation Night, Keynote, Diablo CA, June, 1992
- South Seattle Community College, Commencement Speaker, Seattle WA, June, 1992
- USAF Physiology Convention, Keynote, Brooks AFB, San Antonio TX, June, 1992
- FAA Air Traffic Control Association Conference, Seattle WA, May, 1992
- Washington Dept. of Aeronautics Annual Convention, Keynote, Tacoma WA, February, 1992
- Washington State Patrol, Command Staff Conference, Olympia WA, January, 1992
- U.S. Air Force Tactical Air Command/AWACS Safety Standdown, Tinker AFB, OK, January, 1992
- Washington Pilot's Association State Convention, Keynote, September, 1991
- U.S. Conference on Lifeline Earthquake Engineering, ASCE, Keynote, UCLA, Los Angeles CA, August 1991
- U.S. Air Force Reserve Annual Safety Conference, Colorado Springs CO, September, 1991
- International Aviation Psychology Symposium, Columbus OH, April, 1991
- National Kidney Foundation, Salt Lake City UT, December, 1990
- U.S. Air Force Worldwide Safety Conference, Norton AFB, California, November, 1990

- Aviation Insurance Association, Convention, Memphis TN, May, 1990
- British West Indies Airlines, Trinidad, British West Indies, March, 1990
- City Club of Tacoma, Tacoma WA, January, 1990
- Military Airlift Command Safety Conference, Fairview Heights IL, November, 1989
- Northwest Orient Airlines, Minneapolis-St. Paul MN, October, 1989
- Geological Association of British Columbia, Keynote Address, Vancouver BC, Canada, April, 1989
- Seattle Rotary Club, Keynote Address, Seattle WA, April, 1989
- Flight Safety Foundation, Corporate Aviation Safety Seminar, Keynote, Detroit MI, April, 1989
- The Boeing Company, Executive Seminar, Seattle WA, April, 1989
- U.S. Geological Survey Seismic Safety Workshop, Keynote Address, Portland OR, April, 1989
- >64-89' Committee, 25th Anniversary of the Great Alaskan Earthquake, Address to the Anchorage Seismic Safety Commission, Anchorage AK, March, 1989
- U.S. Air Force Reserve Safety Conference, San Bernardino CA, November, 1988
- National Passenger Traffic Association, Boston MA, October, 1988
- So. California Nursing Association, Seminar, Los Angeles CA, November, 1988
- Park Ridge Hospital/Memorial Lecture Series, Keynote Address, Rochester NY, October, 1988
- MMI Companies Incorporated, Chicago IL, June, 1988
- Alaska Air Carriers Association, Keynote Address, Anchorage AK, February, 1988
- Paper Industry Management Association; Seminar: "Managing for the 90's: The Human Factor," Eugene OR
- National Passenger Traffic Association, Atlanta GA
- American Bar Association, Administrative Law Judges Division, San Francisco CA
- Canadian Union of Public Employees, Ottawa ONT, Canada
- Northwestern University Transportation Safety Conference, Evanston IL
- Congressional Office of Technology Assessment, Program on Human Factors in Airline Safety
- Federal Express Corporation, Northwestern Region Managers, Bellevue WA
- Los Angeles International Airport Cargo Association
- National Airline Pilot Dialogue II, Dallas TX
- MITRE Corporation, Distinguished Lecture Series, Washington DC
- Aviation Law and Claims Conference, London UK

## PROFESSIONAL BROADCASTER

| | |
|---|---|
| 1995- | Aviation Editor, GOOD MORNING AMERICA (ABC) |
| 1994- | Aviation Analyst for the ABC Radio and Television Networks |
| 1994- | ABC Television and Radio Network |
| 1966-1970 | WFAA-AM/FM/TV - Dallas |
| 1962-1972 | Radio/Television Personality and/or Newsman for:<br>KMAP-FM - Dallas<br>KAIM-AM/FM - Honolulu<br>KLIF-AM/FM - Dallas<br>KTAC-AM - Tacoma |

## BUSINESSMAN

1985-Present Principal (CEO, Gen Mgr) of Phoenix Partners, LLC, d/b/a John Nance Productions