# EXHIBIT B

Byers & Anderson
Court Reporters & Video

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

LISA STOUT,                           )
                                      )
                   Plaintiff,         )
                                      )
              vs.                     ) No. C07-0682-JCC
                                      )
UNITED AIRLINES, INC.,                )
                                      )
                   Defendant.         )

VIDEOTAPED DEPOSITION OF JOHN J. NANCE

November 3, 2008

Seattle, Washington

Byers & Anderson, Inc.

Court Reporters/Video/Videoconferencing

One Union Square      2208 North 30th Street, Suite 202
600 University St.    Tacoma, WA 98403
Suite 2300            (253) 627-6401
Seattle, WA 98101     (253) 383-4884 Fax

(206) 340-1316        scheduling@byersanderson.com

(800) 649-2034        www.byersanderson.com

Serving Washington's Legal Community Since 1980

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 2

1                    APPEARANCES
2
3    For the Plaintiff:
4
5                Victoria L. Vreeland
                 Gordon Thomas Honeywell Malanca
6                   Peterson & Daheim
                 600 University Street
7                Suite 2100
                 Seattle, WA 98101
8                206.676.7528
                 206.676.7575 Fax
9                vvreeland@gth-law.com
10
11   For the Defendants:
12
13               Tyson Harper
                 DLA Piper US LLP
14               701 Fifth Avenue
                 Suite 7000
15               Seattle, WA 98104
                 206.839.4892
16               206.494.1784 Fax
                 tyson.harper@dlapiper.com
17
18   Also present: Ed Burke
                 Videographer, Byers & Anderson, Inc.
19               Court Reporters & Video
20               Lisa Stout
21
22
23
24
25

John J. Nance
11/3/08

45

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 3

1                      EXAMINATION INDEX

2    EXAMINATION BY:                              PAGE NO.

3    MR. HARPER                                      5

4    MS. VREELAND                                  284

5

6

7

8                       EXHIBIT INDEX

9    EXHIBIT NO.       DESCRIPTION

10                                                PAGE NO.

11   Exhibit No. 86    27-page Report of Expert        61
                       Analysis of John J. Nance,
12                     dated 8/27/08.

13   Exhibit No. 87    55-page handwritten notes and   101
                       Plaintiff Lisa Stout's
14                     Statement of Facts.
                       Nos. NANCE 000001 to NANCE
15                     000055

16   Exhibit No. 88    3-page Subpoena in a Civil      152
                       Case to John J. Nance.

17

18

19

20

21

22

23

24

25

John J. Nance
11/3/08

46

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 4

1          BE IT REMEMBERED that on Monday,

2   November 3, 2008, at 600 University Street,

3   Suite 2100, Seattle, Washington, at 9:11 a.m., before

4   KARMEN M. FOX, CCR, RPR, CRR, Notary Public in and for

5   the State of Washington, appeared JOHN J. NANCE, the

6   witness herein;

7          WHEREUPON, the following proceedings

8   were had, to wit:

9

10          <<<<<< >>>>>>

11

12          THE VIDEOGRAPHER:   We are now on

13   the record.  My name is Ed Burke, videographer for

14   Byers & Anderson Court Reporters & Video.  We are

15   located at 600 University Street, Suite 2300, Seattle,

16   Washington 98101.  Our telephone number is

17   1-800-649-2034.

18   Today is November 3rd, 2008, and the time is now

19   9:11 a.m.  This is the videotaped deposition of John

20   Nance, being taken on behalf of the defense in the

21   case of Lisa Stout, plaintiff, versus United Airlines,

22   Incorporated, defendant.  The cause number is

23   C07-0682-JCC.

24   This deposition is being held at Gordon Thomas

25   Honeywell at 600 University Street, Suite 2100,

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 5

1    Seattle, Washington.
2        And will the attorneys please introduce themselves
3    for the record, starting to my right.
4                    MR. HARPER:  Tyson Harper for
5    defendant, United Airlines.
6                    MS. VREELAND:  Victoria Vreeland of
7    Gordon Thomas Honeywell for the plaintiff.
8                    THE VIDEOGRAPHER:  And the court
9    reporter today is Karmen Fox.
10        And please swear in the witness and proceed with
11    the deposition.
12    JOHN J. NANCE,              having been first duly sworn
13                               by the Notary, deposed and
14                               testified as follows:
15
16
17                    EXAMINATION
18    BY MR. HARPER:
19    Q   Good morning, Mr. Nance.
20    A   Good morning.
21    Q   Could you please state your full name and spell your
22    last name for the record?
23    A   Yes.  It's John Joseph Nance, N-A-N-C-E.
24    Q   And what's your business address, Mr. Nance?
25    A   2542 Westlake Avenue North, Suite No. 8, in Seattle,

John J. Nance
11/3/08

48

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 19

1    Q    And it's your testimony that United was a pioneer in
2         this area of CRM; is that correct?
3    A    No question about it.  They were the very first ones
4         who obtained an FAA exemption, through people that I
5         know who fought hard for it so they could start a
6         thing at that time called Cockpit Leadership Resource
7         Management.
8    Q    When -- when did that occur?
9    A    It was approximately 1982 to '83, I think, when the
10        exemption was first granted.
11            It was a result of two lawsuits through United.
12        One, the 1978 December 29th loss of a Douglas DC-8 in
13        Portland, Oregon --
14   Q    Mr. Nance, if I could interrupt you.
15   A    Sure.
16   Q    I appreciate that you have a lot of information, but
17        I'm going to ask you some specific questions.  In the
18        interest of time, I'll ask you to limit your
19        questions --
20   A    Sure.  No problem.
21   Q    -- or limit your answers.
22                   MS. VREELAND:  Well, I'm going to
23        object.  You can ask a question.  Mr. Nance will
24        respond.  If he feels the need to clarify, then he
25        will.

John J. Nance
11/3/08

49

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 20

1  Q  (By Mr. Harper)  What's your basis for saying that

2     pilot error is very rare?

3  A  Approximately -- let's see.  '77.  We're in '08.  So

4     around 31 years of evidence in accident investigation.

5     Many years of involvement of myself.  One book,

6     nonfiction, called Blind Trust in 1986, which became

7     kind of a pacesetter in moving Crew Resource

8     Management into the lexicon.  And just a continuous

9     amount of involvement as I've moved that into medicine

10    for the past 18 years.

11 Q  Are you aware of any statistics that break down the

12    causes of accidents between pilot error versus human

13    error?

14 A  Oh, yes.  There are myriad.  I can't cite you chapter

15    and verse.  They're just kind of almost -- what's

16    the -- what's the term we use legally?  Res ipsa

17    loquitur, almost.

18      If you look at most of the human factors

19    literature in aviation in the past 20 years, 25 years,

20    the National Transportation Safety Board's overall

21    analyses at various times, it's all very consistent.

22      Can we squabble over whether it's 80 percent or 94

23    percent or 92 percent?  Sure.  But the -- there's no

24    question that the vast, vast -- more than the

25    majority, almost all the accidents can temporarily

John J. Nance
11/3/08

50

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 21

1    have been a result of human error, in terms of the
2    primary chain, the causal chain, and all the different
3    contributing factors.
4    Q    Where are those statistics kept or where do you get
5         those statistics from?
6    A    The National Transportation Safety Board would be a
7         very good place to start.
8              I would imagine -- I haven't done this lately.
9         It's just -- you know, it's a matter of article of
10        faith among those of us who fought this battle from
11        the beginning, but probably if you Googled human error
12        in aviation, you would come up with about twenty or
13        thirty thousand citations.  Many of those would be
14        useful.
15             Dr. Bob Helmrich -- "rick," rather -- of the
16        University of Texas has also been a pioneer in this.
17        He gave us many of the papers and the statistics of
18        the underpinning of the late '80s and early '90s that
19        got us beyond that very question that you asked, which
20        was asked in the mid-'80s by doubting airline leaders
21        who weren't sure they wanted to spend the money on
22        this new discipline.
23             We have --
24   Q    What question are you referring to?
25   A    The question that you just asked, which was

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 27

1    report, and you haven't even gotten to that yet.

2        But go ahead.  I object to the form.

3    A   All right.  I think even far more seriously than any

4        legal duty, United, from the facts I have been

5        given --

6    Q   (By Mr. Harper)  In terms of -- I just want --

7    A   I'm not --

8    Q   -- you to answer the question that I've asked --

9                    MS. VREELAND:  Excuse me.

10   Q   (By Mr. Harper)  -- and that is:  Are you opining in

11       your report or will you opine in front of the jury

12       that United, through its actions, has violated a legal

13       duty?

14                   MS. VREELAND:  Object to the form.

15       That is not what Mr. Nance's opinions states, and

16       that --

17                   MR. HARPER:  Can you please end with

18       the speaking objections, Counsel?

19                   MS. VREELAND:  Well, Counsel, then

20       will you please let Mr. Nance answer the questions

21       that you asked?

22       You told him at the beginning you would not

23       interrupt.  You're trying to twist it around.  You

24       know there's no legal opinions stated in the report.

25           I've made my objection, and I wish that you would

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 28

1      have let him answer the question.

2                         MR. HARPER:  Can you repeat my

3      question, please?

4                              (Question on Page 27,

5                              Lines 10 through 13,

6                              read by the reporter.)

7

8    A   I will tell you that my report and what I would say to

9        a jury in accordance with that report, as I sit here

10       now, I'm not here to evaluate the direct legal

11       violation of any particular law or FAR.

12           I am here to tell you what the broader effect was.

13       And that is far more serious than a statutory

14       violation.  And in that sense, United violated the

15       very premises that they helped to pioneer.  And that's

16       extremely serious and extremely violative of the basic

17       premises of air safety.

18    Q   (By Mr. Harper)  Let me go back to the question I

19        asked a couple of questions ago.  And that is:  Are

20        you offering an opinion regarding whether United

21        retaliated against Ms. Stout for making reports of

22        pornography on the flight deck?

23    A   Again, given the facts -- or the things that I have

24        been presented with to study, based on that, the

25        conduct that I saw indicated that this was clearly

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 29

1    conduct that rose to the level of retaliatory conduct.

2    And retaliatory conduct, per se, is conduct that,

3    when taken against an active air crew member, is

4    violative in the extreme of the basic procedures that

5    we now know are necessary for air safety; i.e., you do

6    not want upset pilots in the cockpit.

7    And someone who has been treated as Ms. Stout was

8    treated while she was still a line pilot is going to

9    be, without question -- any of us would be upset.

10   Consequently, when you look at the question of

11   retaliation, when somebody makes a report of something

12   that they believe, as a responsible crew member,

13   should be solved, without reference to whether or not

14   there is a legal structure around that says that, yes,

15   this conduct -- or the things in the cockpit that she

16   found are violative, when you have a pilot who says,

17   "I don't like the way the windshields are being washed

18   and it worries me and disturbs me," if the response of

19   the company, after discussing this, is to treat that

20   individual as an irritant and put letters in their

21   file or tell them that they are red-flagged or in any

22   other way make them the problem, not the report, that

23   is retaliation and that is violative of what we know

24   is the best policy for trying to maintain air safety.

25   Q   What facts form the basis of your opinion that

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 30

1      United's conduct was retaliatory?

2    A  Well, the basic overall set of facts are that

3      pornography was being found by Captain Stout

4      repeatedly in the cockpits of which she was in charge.

5      Apparently other captains were finding the same thing.

6          She properly complained about it, in a way that

7      was certainly the proper use of the logbook in any

8      Part 121 operation.  And apparently United had said,

9      at least later on, that that was the way these things

10     were to be done.  And after a very ineffectual and

11     nondedicated response that was clearly not calculated

12     in any reasonable way to be effective -- in other

13     words, if it was way below the threshold of any

14     reasonable expectation that this was going to stop the

15     matter -- when she continued to complain, suddenly she

16     becomes the problem.

17         This is -- this is not difficult to understand.

18     You see this in medicine.  We see this in so many

19     different areas of human institutions.  When a

20     particular individual is complaining, legitimately,

21     about something -- that is their job, that is within

22     the realm of their expertise -- and the company, for

23     one reason or another, at the level that the

24     complaints are hitting, feels unable to do anything,

25     at least at that point or later, when they turn on the

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

1  reporter and basically are saying sit down and shut
2  up -- which was never stated to her, but that's the
3  effect of it, whether it's military or whether it's
4  medicine or whether it's aviation -- the effect of
5  that is clearly -- or I should say the -- the fact of
6  that is clearly retaliation.
7      It's horizontal hostility, and it is done out of
8  misguided irritation, usually by the people who are
9  making these decisions to red-flag or to put a letter
10  of reprimand or whatever else in somebody's file,
11  which is an extremely serious thing to a pilot, this
12  is the opposite of support, and it has the effect,
13  whether it was meant that way or not, of saying sit
14  down and shut up.
15      But more importantly, it also has the effect of
16  saying to all the other pilots, This is what will
17  happen to you if you step out of line.  In other
18  words, if you report something to us that we don't
19  want to hear beyond a certain point, then these are
20  the things that are going to happen to you.
21      The case that I cited to you with Delta Airlines,
22  Delta's response to these three guys who failed to put
23  the flaps in the right position was to fire them.
24      Now, stop and consider this for a second.  Here
25  are three guys that made an inadvertent human mistake.

John J. Nance
11/3/08

Byers & Anderson
Court Reporters & Video

Page 41

1    organization to inquire, okay, this captain has called

2    in a couple of times sick.  What's going on?  What's

3    going on?

4        It's not a matter of counseling and letters at

5    first.  It is a matter of saying, all right, you're

6    still flying our airplanes when you do show up.  Is

7    something going wrong in your life?  Because if so,

8    that is a direct responsibility of the company to be

9    concerned with it and to help you, if we possibly can,

10   and to find out what's going wrong.  We don't want

11   upset people flying airplanes.

12   Q   What's your basis for saying that's the company's

13       responsibility?

14   A   Well, when the -- when we as a people, under Part 121

15       of the Federal Air Regulations, which is the highest

16       level of air and standard and duty provided to anybody

17       who is operating as an airline.  When we grant that

18       certificate, in effect, and we let a company operate,

19       doesn't matter whether they're the biggest or the

20       smallest, the fact is, they have an evolving

21       responsibility as we learn things over time.  And

22       United, of course, was in the position of helping us

23       to evolve this information.

24           Once you know that if you do A, a detriment to

25       safety called B occurs, you can't hide from it because

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 42

1    it isn't in black letter law.  In other words, you

2    have the responsibility legally, ethically, morally as

3    an airline to make sure that you don't back away from

4    that.

5        It is never enough, in 2005, 2001, or 2008, never

6    enough for a certified air carrier or any of their

7    people to say, well, we've got an upset pilot over

8    here, but, you know, I personally just don't care

9    what's upsetting them.  They're a troublemaker anyway.

10   We'll let them fly, but, you know, I'm not going to

11   get involved in that.

12       No.  As a matter of fact, as I've counseled people

13   to say in the cockpit and in the operating room, you

14   know, How is this going to sound at the hearing?  The

15   company needs to think really hard, any company, about

16   that kind of a statement and that kind of an attitude.

17       It's very important to understand that when you

18   have the responsibility to the public that is of the

19   highest order, which airlines certainly do, it's not

20   just enough to say, well, they're qualified and

21   capable to fly our airplanes, but we're upset with

22   them because they've been calling in sick or they've

23   been arguing in the hallways and operations or they've

24   been snappy lately.

25       Excuse me, those are red flashing lights.  The

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 43

1      flight manager needs to be immediately pulling that

2      individual aside and saying, What's going on?  Are you

3      okay?  What's going on in your life?  Tell me.  Let's

4      sit down and talk a little bit.

5          That's what those managers are there for.

6    Q   Going back to the issue of retaliation, you've opined

7      that United retaliated against Ms. Stout.  I want to

8      know the specific facts that you've based that opinion

9      on.

10   A   Well, first of all, let's just look at the letter that

11     was put in her file.  I found it laughably

12     disingenuous that the individual who wrote that letter

13     would suggest in deposition that -- that this was a

14     nonevent, this wasn't of any importance.

15         There is not a sentient airline pilot on this

16     continent who would not take that as a massive frontal

17     assault, preparatory to being dismissed.

18   Q   What's your basis for saying that?

19   A   Well, how about having flown for two airlines, having

20     been involved in this industry since 1975, as the

21     record shows, a pilot for Braniff for seven years.  I

22     was a pilot for Alaska, retired from Alaska.  I have

23     had a professional position with the Airline Pilots

24     Association in the past on air safety.  And, you know,

25     I think my pedigree is unassailable in that regard.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 44

1          I know this industry and I've been at it and I've
2     flown as a pilot, and I guarantee you that whether it
3     was with Braniff or whether with Alaska, you put a
4     letter in my file, it would be no doubt in my mind
5     that I was being groomed for termination.  And I would
6     have to fight it with every ounce of my ability,
7     including probably go out and lawyer up if necessary.
8  Q  What research did you do to come to the conclusion
9     that a letter of counsel is, in every case, a
10    precursor to dismissal?
11 A  Well --
12                    MS. VREELAND:   Object -- object to
13    the form.  Misstates the testimony.
14 Q  (By Mr. Harper)  Well, let me ask the question again.
15         Is it your testimony and your opinion that when a
16    letter gets placed in somebody's file, that it's
17    always a precursor to dismissal?
18 A  No, it's not always.  There are times that that's done
19    negligently or stupidly.  There are times that
20    somebody is a frustrated manager who really shouldn't
21    be a manager, who does something like that with the
22    intent to slap a wrist, without understanding fully.
23         But very few managers have not been line pilots.
24    And line pilots all, to a person, understand the
25    significance.

John J. Nance
11/3/08

60

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 45

1    Does it mean that it is a precursor to a
2    determination of the company to dismiss?  No.  But is
3    it always a flag?  A first step in any sequence of
4    dismissal is always a letter or something in the file.
5    You start seeding the record.
6        Anyone who deals with a union in aviation or
7    Boeing, you name it, if you're going to dismiss a
8    union person, you have to build a record.  Everybody
9    knows this.  This is -- you know, this is Human
10   Resources 101.  And it's certainly no different in
11   aviation.
12       But in aviation, whereas not everyone out there in
13   industry would understand this, pilots absolutely
14   understand this, a letter in the file is a very
15   potentially lethal thing.  And it's not just lethal
16   because it might lead to termination.  It is a massive
17   assault and a very, very deleterious assault on the
18   self-esteem of that pilot.
19       Pilots are very much like surgeons.  As a matter
20   of fact, incredibly so.  The more I deal with this,
21   parenthetically, I'll say the more I'm amazed at how
22   similar we are.  You have to have a healthy ego.  You
23   have to have a certain level of steady self-esteem to
24   be able to do what you do and make the decisions that
25   you make.  And if that ego, that self-esteem, that

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 46

1    picture of yourself is injured in any substantial way,

2    especially if it's injured at the hands of your

3    company, your ability to stay at the highest level of

4    performance is immediately compromised.

5        On top of that, you're a very upset individual

6    because you have just been told that your company does

7    not have the confidence in you.

8  Q What's your basis for saying that a pilot who receives

9    a letter in their file is going to lose their

10   confidence?

11 A Well, as I say, you take a look at my entire history

12   in aviation -- and I have seen this consistently -- if

13   we could put a label on it from a legal aspect, it

14   would be res ipsa loquitur.

15       In other words, it is very clear, any airline

16   pilot you drag in the door and ask that question of is

17   going to say the same thing:  yeah, it's an assault on

18   me.  It's telling me that my company does not have the

19   confidence in me.  They're mad at me for something.

20       Maybe it's a specific incident that the pilot can

21   then compartmentalize, but in a general sense, you

22   know, we're watching you, we're not happy with your

23   performance.  People have been talking about you.

24       The things that I read in the record here,

25   followed by a letter, is a massive assault on one's

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Page 47

1    self-esteem.

2    Q   What research have you done to come to the opinion

3        that all line pilots would come in and say the same

4        thing you're saying here today?

5                    MS. VREELAND:   Object to the form.

6    A   Well, again, you're -- you're kind of ignoring my

7        record.

8            But as far as specific research on this?  I have

9        been involved in so many different follow-ups of

10       accidents, watching over the NTSB's shoulder as they

11       spaded up the background of particular pilots,

12       including some who basically underperform because they

13       were in the middle of an assault by their company,

14       either justifiably or unjustifiably.  In some cases --

15       I don't recall the individual incident.  I think it

16       actually was -- I think it was Eastern Airlines, but

17       it's back in the '70s, but I recall clearly the fact

18       was, this pilot shouldn't have been flying because the

19       company was not happy with him, and he was -- he was

20       not concentrating on the job.

21           I can tell you, at Braniff International in our

22       last year, why we didn't crash and kill somebody is

23       known only to God, because we were a totally

24       distracted pilot force, watching our airline slip over

25       the ledge.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 48

1      So, you know, could I go out and write you a paper
2   on this with citations?  Sure.
3      That wasn't the scope of my preparation here,
4   but I could tell you with every ounce of, you know,
5   professional efficacy that I've had in this area, that
6   this is the gospel truth I'm telling you.  You have to
7   have a healthy self-esteem.  If you don't, it
8   diminishes your performance level because you're
9   distracted.
10  Q   Now, you said a second ago that when you were at
11      Braniff and the company was in financial trouble, that
12      the pilot force was distracted.  Is that right?
13  A   Oh, absolutely.  From 1981 to 1982.  We failed on
14      May 12th of 1982.
15  Q   And it's your opinion that that distraction was such
16      that none of the pilots should have been flying?
17  A   Well, I wouldn't say none of us should have been
18      flying.  I will say clearly that our level of
19      distraction was such that most of the time, we were
20      not coming up to the level of performance and
21      concentration on the job that the public had a right
22      to expect.
23  Q   Now --
24  A   I've said that in public, and I will at any time.
25  Q   -- when United went through their bankruptcy, did the

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 49

1    United pilot force have a similar problem?

2  A  In United's case -- I wasn't living with them, of

3     course. I wasn't a United pilot. But in United's

4     case, there had been so many shocks before that

5     particular bankruptcy, that I really doubt it had the

6     same situation.

7        Braniff had been, you know, up and coming, going

8     to conquer the world, up until the last. And so it

9     was a sudden reversal.

10       My point here, without belaboring all this and

11    getting too far off subject -- I mean, you can ask me

12    more if you want -- is to say that distractions, upset

13    pilots, pilots who are worried, especially about their

14    longevity as a pilot, are not going to be able to rise

15    to the level of concentration and professionalism we

16    want.

17       So anytime a company does something that is

18    clearly, clearly going to have that impact, they are

19    making -- they are making a very serious move. And

20    when you put a letter in somebody's file, a pilot's

21    file, a Part 121, it is a massively upsetting thing to

22    that pilot. And I don't think that you'd find anyone

23    who would not agree with me in the entirety of, what,

24    29,000 airline pilots.

25  Q  So you think that each and every one of the 29,000

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 50

1    airline pilots you just referenced would find it

2    massively upsetting to have a letter put in their

3    file?

4  A    If they didn't, they really don't have any idea what

5    business they're in.

6        Yes, I believe that every single one of them who

7    has -- and I would assume this is almost all.  You're

8    always going to have a human bell curve.  There will

9    be some exceptions.  Any professional pilot who has

10   fought so hard to get to that position, especially

11   with a major airline, would be massively upset and

12   assaulted.

13  Q    And how many of those 29,000 pilots have you

14   personally spoken to about this issue?

15  A    About this particular issue?

16  Q    Yes.

17  A    Probably, over time, maybe 40 or 50, over my entire

18   career, about issues regarding letters, issues

19   regarding actions by the company; some quite

20   legitimate, some not.

21       As a matter of fact, in some cases, one of the

22   things we discussed at the Airline Pilots Association

23   was the supporting -- the need to support a company

24   and removing somebody from line flying at the very

25   first of a -- a sequence where they were going to

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 51

1 start seeding the file with letters, because otherwise
2 the very act of putting that letter in started a roll
3 of upset.
4     There's another analogy about this, too, that
5 anybody who's ever been a flight instructor will tell
6 you; in the Air Force, in the Navy, and in civilian.
7 You can blow a check ride -- we call it bust, which is
8 terrible English -- but you blow a check ride, and if
9 you are a line pilot, you already have your job, you
10 want to keep it, as all of us do.  And suddenly the
11 company says, well, now, you know, we're going to give
12 you a recheck, and if you fail that, we're going to
13 give you a recheck and everything's fine, it's a
14 slippery slope, because once you have messed that up,
15 not only is your ego and your self-esteem assaulted by
16 what you may have done, you know, by messing something
17 up in that check ride, but now the nervousness is so
18 great, that your biggest challenge is a thing we call
19 "checkitis."
20     In other words, you're so distracted, worrying
21 about the mistakes that you made, that you're not
22 paying attention to the mistakes that you don't want
23 to make.
24     And this is, in a broader sense, precisely what
25 we're talking about.  When you put a letter in

John J. Nance
11/3/08

Byers & Anderson
Court Reporters & Video

Page 54

1    industrial approach to it.  It has to be an aviation

2    approach.

3        And in that sense, clearly there was a connection

4    that would lead to the conclusion of anybody looking

5    at this with any experience in airline management or

6    airline operations, that this was a retaliatory

7    action.

8        In other words, she would have been very justified

9    to conclude that.  So would any other pilots looking

10   at this.  She complains here.  They aren't able to

11   solve the problem.  Now they're attacking her.  And

12   there was nothing before that.

13   Q   Any other evidence?

14   A   I -- to my mind, that's conclusive.

15   Q   Now, what if a management pilot honestly believes that

16   a letter of counsel is appropriate; it has nothing to

17   do with the prior reports?  Is it your opinion that

18   their discretion to take action is constrained because

19   of the impact it will have on air safety?

20              MS. VREELAND:  Object to the form.

21              THE WITNESS:  You want me to...

22   Q   (By Mr. Harper)  You can answer.

23   A   All right.  I want to make sure I understood the

24   question.  I'm not trying to jerk your chain, but

25   would you repeat it for me again?

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 55

1          MR. HARPER:  Could you repeat it?

2                (Question on Page 54,

3                Lines 15 through 19,

4                read by the reporter.)

5

6    A    It should be.  It should be.  That's the proper way to

7         state it.

8              Could an honest individual have a difference of

9         opinion, not see that, and feel that they could take

10        action with impunity?  Of course.  I mean, that's part

11        of the human error profile; that you can say if that

12        was or was not a human error, it could be.  It might

13        have been a bad decision in any case.  In this case,

14        it was clearly a bad decision.

15             But the -- the situation is that air safety and

16        how far we've come simply cannot be allowed to be

17        compromised by saying, well, they had a legal right to

18        do this, and he had a legal right to not have to worry

19        about the possible impact on this pilot, so this was

20        the appropriate action.

21             No, in the grander scheme of what we know and what

22        United knows, no, it was not the proper reaction.

23        Never will be.

24             In a nuclear power plant, it would not be the

25        proper reaction.  In a hospital, it would not be the

John J. Nance
11/3/08

69

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 56

1    proper reaction.

2    Q    (By Mr. Harper)   Okay.  So the legal rights that

3         United may have are constrained by the impact that

4         their decisions are going to have on air safety?

5    A    Yes.   And clearly, and we as lawyers know this, law is

6         always somewhat behind, laws and regulations and

7         aviation are always somewhat behind the realities that

8         we learn of our human systems.   And this is a prime

9         example.

10        There will probably be other areas that we could,

11        you know, in a non-deposition, sit here and talk about

12        for hours about where the regulations and the laws say

13        you have the right to do this, but it would be a very

14        dumb idea to do because of what we know in terms of

15        the effect on the force.

16   Q    Other than the letter of counsel, what other evidence

17        do you have that United retaliated against Captain

18        Stout?

19             MS. VREELAND:   Object to the form.

20        Asked and answered in detail.

21   A    Well, I think my report speaks for itself, and that it

22        clearly went through the various points that had been

23        presented to me and elucidated where -- where that

24        really did rise to a level of retaliation.

25        More importantly, whether we use the word

John J. Nance
11/3/08

70

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 57

1    "retaliation" or not, it rose to a level of horizontal

2    hostility.

3    Q    (By Mr. Harper)   What does that mean?

4    A    Horizontal hostility is where a group perceives

5    themselves to be oppressed.  Now, that oppression may

6    be, for instance, like in nursing, where they really

7    do feel they have zero power, And when somebody

8    presses on them, they -- they can't press back up

9    because nobody's listening.  So they attack each

10   other.

11        It's a well-known phenomena.  And I've been

12   dealing with it in medicine, and I've backtracked it

13   to aviation in some areas too.  Not as bad in

14   aviation.  But when you have a level of managers in a

15   gigantic organization, which United clearly is, and

16   they have tried to make something right -- they've

17   tried in this case to get this smut out of the

18   cockpits -- and they have been ineffectual at it,

19   nothing that they have done has risen to the level

20   that is reasonably going to be able to get it done,

21   and they finally, out of apparent frustration -- I'm

22   putting that word in, but this is what I tend to

23   see -- they're abandoning the efforts.  The message to

24   maintenance doesn't even go out for months, and yet

25   the spark that started all of this is still firing

John J. Nance
11/3/08

71

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 69

1   because here again, it was a fellow -- I haven't

2   thought about this in a long time -- who was reporting

3   things and being hammered in a very unsophisticated

4   fashion by people whose clear intent was to -- to not

5   have to change a fairly unsafe system.

6       Specifically, the Bandeirante airplane was not

7   capable of providing enough lift to stay in the air

8   with one engine above certain altitudes, and they

9   operated in three places in which that was known, and

10  yet they were trying to conceal it.

11      That one went on and on and on.  That was probably

12  late '80s.  And I may be forgetting something, but

13  those are the ones that I remember right now.

14      Oh, wait a minute.  I'm sorry.  I'm forgetting

15  one.  Probably six years ago, I can't remember the

16  defendants or the plaintiffs, but it involved a -- it

17  involved a company with a King Air up in Alaska

18  that -- let's see.  It had to do with the wing spar.

19  It's been a long time.

20      And I never -- I don't think I did it -- yeah, I

21  did a deposition in that and an opinion, but there was

22  no trial.

23  Q   Who were you testifying on behalf of there?

24  A   I think --- I think the defendant was Raytheon-Beech.

25      And I don't remember the name of the plaintiff.  1

John J. Nance
11/3/08

72

Byers & Anderson
Court Reporters & Video

Page 70

1    think I was testifying. for the plaintiff.

2        It was an interesting case because it involved a

3    maintenance area that I was familiar with, and I owned

4    a King Air too.  So...

5    Q   Where in Alaska was that?

6    A   Anchorage, although I never went up there.  They came

7    to me.

8    Q   Was it federal or state court?

9    A   I believe that one was state.

10       Again, this is all subject to memory.

11                    MR. HARPER:  Let's take a short

12   break.

13                    THE VIDEOGRAPHER:  We are going off

14   record.  The time is 10:31.

15                        (Recess 10:31-10:48 a.m.)

16

17                    THE VIDEOGRAPHER:  We are back on

18   record.  The time is 10:48.

19

20

21                    EXAMINATION (Continuing)

22   BY MR. HARPER:

23   Q   Have you ever previously acted as an expert concerning

24   any case or any matter involving pornography on the

25   flight deck?

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 71

1   A   No.

2   Q   Have you ever acted as an expert in any prior case

3       involving distractions on the flight deck?

4   A   Give me a minute.  I might have to think about that.

5           I don't think anything on point, no.

6   Q   Is it your opinion that a company has a duty to

7       correct any distraction on the flight deck, no matter

8       how small it is?

9   A   Any distraction on the flight deck?  That would be

10      excessive.

11          I think it was Voltaire said "Define your terms

12      and I'll speak with you."  So we've got to define

13      that.

14          Obviously human beings on a flight deck in a

15      collegial situation are going to have conversations.

16      There are going to be interruptions.  But it is not

17      difficult, frankly, for a professional airline

18      management, especially in operations, under the vice

19      president of operations and chief pilots, to

20      understand what crosses the line into distractions

21      that could be a problem.

22          Over the years, different airlines have actually

23      put different things in their manuals; you know, no

24      magazine reading, no book reading, no listening to

25      recorders and things like this.  But most of it is

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 72

1    simply understood.  You're dealing with very

2    professional individuals here.

3        So is it the responsibility of an airline to jump

4    on any and every little distraction?  No.  That would

5    actually stifle the free flow of information.

6        But when something comes to their attention

7    operationally over time, or the attention of the

8    industry, that -- that has a reasonably high potential

9    for distracting from the professional performance of

10   the flight crew at the highest level, then, yes,

11   that's where their responsibility kicks in.

12       It would have to be a case-by-case basis.

13       Certainly -- let me just add this:  Certainly when

14   it goes to the heart of the individual performance of

15   the pilots, based on their distraction, illness,

16   chronic fatigue, anything that would -- that would

17   clearly be a detriment to their ability to concentrate

18   and perform at the highest levels, then there is an

19   affirmative obligation on behalf of the company to --

20   to at least find out what's going on, if not interdict

21   it.

22             THE REPORTER:  If not what?

23             THE WITNESS:  If not interdict it.

24   Q   (By Mr. Harper)  You indicated it was a -- the

25   standard is a reasonably high probability of

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 73

1    distraction?

2  A    I would say -- yeah, I would say reasonably.

3         We could dicker over the exact terminology, but

4    let's put it this way:  If you know, as a chief pilot,

5    that your guys are using cell phones on the ground and

6    you're -- even when they're pushing back, they're

7    still talking on cell phones, that's clear, you've got

8    to stop that.  That's probably even legally violative.

9         But let's say you find out that, as a chief pilot,

10    that two crew members are constantly getting involved

11    in deep political discussions just above 10,000 feet,

12    and even though the rule says above 10,000 feet, the

13    quiet or the sterile cockpit rule doesn't apply, you

14    still have an obligation to say to these guys or gals,

15    look, that's probably inappropriate.  So, you know,

16    we've heard about this, we'd like you to calm it down.

17         It really is case by case when it has to do with

18    interactions in the cockpit, because again, you do not

19    want to interfere with collegial full flow of

20    communication.

21         When it comes to the individual performance, as I

22    say, in those elements that I mentioned earlier --

23    fatigue, distraction, upset, et cetera, et cetera --

24    those were elements that, once seen by anybody in

25    management, there is the highest level of obligation

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 74

1      to do something about.

2           Why?  Because we know where that can lead.  We

3      know it can lead to a major safety problem, if not an

4      accident.

5   Q  How do you know it could lead to a major safety

6      problem?

7   A  I would cite you to 25 years of NTSB human factors

8      performance discussions, in which, if not to a report,

9      at least in most of the reports, there are discussions

10     of what could have been distraction, what could have

11     been a problem in fatigue or in any other human

12     element that would degrade performance.  They are

13     always very concerned about this, and you see it show

14     up time and time again, and properly so.

15          When you're taking apart an accident, one of the

16     areas for inquiry that we never did, the NTSB never

17     did before the late '70s, and now it's always there,

18     is to look back in the previous up to 72 hours of a

19     pilot's life, and maybe further than that if there are

20     particular problems that were endemic; i.e., this

21     individual was always fatigued, this individual was

22     horribly distracted by his personal life coming apart,

23     or something of that nature.  Then, yes, we need to

24     know about it because it probably has a role in the

25     causal -- causal chain.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 75

1      I hope that was responsive to you.  I've lost the

2   question now.

3   Q   Has there ever been an incident or any sort of

4       accident in the airline industry, that you're aware

5       of, that was caused by a distraction due to

6       pornography on the flight deck?

7   A   Due to pornography?  I don't think that there has been

8       such an accident, that I'm aware of.

9           Certainly I could cite you a bunch where there

10      were distractions, but -- you know, and I haste to

11      say, and you can stop me if you want --

12  Q   I think you've answered my question.

13  A   All right.

14  Q   What do you consider to be your field or fields of

15      expertise?

16  A   Well, I have several, but air safety and the evolution

17      of human factors in air safety.  And medical safety,

18      as I say, for the past 18 years.

19  Q   Medical safety, you said?

20  A   Mm-hm.

21  Q   Any other areas --

22  A   You want to go over my entire --

23  Q   Do you consider yourself to have expertise in any

24      other fields?

25  A   Well, yes, I do.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 76

1    Q    What fields are those?

2    A    Well, first of all, I'm a professional broadcaster

3         with -- I've been at it for many, many years.

4              I am still a -- the aviation analyst for ABC World

5         News and for Good Morning America, and paid regularly

6         with them.  I've been with them about 13 years now.

7         I've got thousands of broadcasts under my belt.

8              I am an attorney, although I am in a nonpracticing

9         out-of-state status, but I -- you know how that goes;

10        pay your dues and I'm back on.  But Texas is my

11        jurisdiction.

12             I have been an author, and continue to be.  19

13        books so far.

14             And let's see.  I am also a U.S. Air Force pilot

15        and officer, now in the retired reserve, but

16        fortunately, we can come out of retirement under

17        certain circumstances.  I'm a lieutenant colonel in

18        the USAFR Reserve.

19   Q    Is that an area of expertise, or is that just

20        something in your background?

21   A    We spent a year getting that area of expertise as a

22        pilot.  It's an undergraduate pilot training, and then

23        advanced training.

24             A pilot in the Air Force or the Navy --

25   Q    I'm just looking for your fields of expertise.

John J. Nance
11/3/08

79

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 77

1  A  Well, my field is expertise is piloting, in that

2     regard.  And I certainly -- and I have 13,000 some odd

3     hours as a professional pilot and as a private pilot,

4     over -- I think '65 was when I got my original

5     license.  So you can put that in one box as

6     professional piloting.

7        Professional officer; I was a lieutenant colonel

8     in the Air Force.  Law.  Broadcasting.  And, as I say,

9     aviation safety.

10       And I'm probably missing something, but those are

11    the -- those are the prime elements.

12  Q  Do you consider yourself an expert in earthquake

13    safety?

14  A  No, not an expert, but I was a good reporter.  I wrote

15    a book on that, that was widely hailed by the

16    geophysical community.  And that was in 1988.  And I

17    reprised lot of that information in a novel called

18    Saving Cascadia a few years back, in which I went back

19    to the same professionals in the field to make sure I

20    got it right.

21       So but am I a -- no.  In that and in the book on

22    atmospherics that I did in '91, I'm an informed

23    reporter.  I'm not the expert.  I don't have the

24    scientific training to claim expertise there.

25  Q  What area of the law do you consider yourself an

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 78

1    expert in?

2    A    Well, I don't.  Air law would be the closest, but I

3         have not maintained currency and, therefore, I could

4         not claim that.

5    Q    You're not an expert in employment law?

6    A    No.

7    Q    Not an expert in psychiatry or psychology?

8    A    No.

9    Q    Not an expert in sexual harassment?

10   A    No.

11   Q    Not an expert in how to prevent or remediate sexual

12        harassment?

13   A    Nope.

14   Q    Are you an expert in airplane maintenance?

15   A    No.

16   Q    When's the last time you piloted a commercial

17        airplane?

18   A    I think the last flight I flew for Alaska Airlines was

19        1997, if I'm not mistaken.

20        I'd have to go back and check.  I could be off a

21        little bit on that.

22   Q    And what kind of airplane?

23   A    A Boeing 737-400.

24   Q    When is the last time you piloted any plane?

25   A    About two months ago.

John J. Nance
11/3/08

81

Byers & Anderson
Court Reporters & Video

Page 79

1    Q    What kind of plane?

2    A    In that instance, it was a Cessna 172.  I sold my King

3         Air earlier this year.

4    Q    How big is a Cessna 172?

5    A    It's a four-passenger airplane, single engine.

6    Q    Have you ever addressed the issue of pornography on

7         the flight deck in any of your previous work?

8    A    Have I addressed in it my work?  No.  I've encountered

9         it, yes.

10   Q    You've encountered pornography on the flight deck?

11   A    Oh, yes.

12   Q    When?

13   A    As a pilot for Braniff International.

14   Q    When was that?

15   A    We had a rash of this back in the 19 -- I was hired in

16        1975, and we went bankrupt on May 12th of 1982.  And

17        at various times in the 727 fleet, there were

18        flare-ups of this sort of thing.  Exactly what Captain

19        Stout had indicated.

20             And in each instance, the company would, in

21        Draconian fashion, warn people that instant

22        termination would be the response if it was found.

23             They were dealing at a time there in which the

24        good old boy club of male domination was up against

25        four female pilots.  And the company was very good

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 99

1        communication style?

2    A   It's inappropriate only when you do not identify the

3        people.  It's very important, because this is not a

4        criminal situation, you know, where people have to

5        confront you, but it is still very important, because

6        it's always possible for some unnamed source to -- to

7        have a beef with you.

8            And in fact, in one case I remember at Alaska,

9        one captain was told that they'd had a couple of

10       complaints, but when it got down to it, it was the

11       same copilot who had put in something like 20

12       complaints over 25 flights with every captain he had

13       had.  The problem really was the copilot that was

14       coming apart.

15           But it's just -- it's something that you've got to

16       be very careful about evaluating and finding out

17       whether or not you've got a pattern here that

18       indicates a lack of ability to maintain a collegial

19       atmosphere.

20                   MR. HARPER:  Let's take a break just

21       to change the tape.

22                   THE WITNESS:  Okay.

23                   THE VIDEOGRAPHER:  We're going off

24       record.  The time is 11:24.  This is the end of Tape

25       No. 1.

John J. Nance
11/3/08

83

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 100

1          (Discussion off the record.)

2

3          THE VIDEOGRAPHER:  We are back on

4   record.  The time is 11:27.  This is the beginning of

5   Tape No. 2.

6   Q   (By Mr. Harper)  What were you asked to provide an

7       opinion on in this case?

8   A   I think I elucidated that in here.

9          It was a number -- of course, it was the elements

10      of this particular case based on what I was given,

11      that -- that impinged on safety, principally; if they

12      did or not.  And whether or not some of the other

13      actions, since the initial problem with the

14      distraction over the pornography in the cockpit in my

15      view was clearly an impact on safety, what was done,

16      was that effective.

17         And there were several other elements, all of

18      which I've outlined here in this report.

19  Q   Can you remember any other elements without looking to

20      your report?

21  A   Well, I'm sure I could if I thought long enough.  I'd

22      really prefer to go to the report here and give you

23      those categories.

24  Q   Were you given written instructions from anyone about

25      what opinions they would like you to give or --

John J. Nance
11/3/08

Byers & Anderson
Court Reporters & Video

Page 101

1    A    No.

2    Q    -- oral instructions?

3    A    Nobody is successful in doing that to me anyway.

4         But, no, I had -- I had a list, which you have a

5    copy of, from Vickie Vreeland of the chronology of the

6    case.

7         And then I was given a -- we had a phone

8    conversation before anything else, and she had written

9    some notes down on that phone conversation of what I

10   said to her, and then sent me a summary of both her

11   chronology of the case and then some notes that she

12   had on what I had said back to her, just to make sure

13   that we understood each other.

14                    MR. HARPER:  Just so we all know

15   what we're talking about, I'm going to mark Deposition

16   Exhibit 87.

17                         (Exhibit No. 87 marked

18                          for identification.)

19

20                    MS. VREELAND:  Is this the whole

21   file all in one exhibit?

22                    MR. HARPER:  Yes.

23                    THE WITNESS:  These would be my

24   notes.

25   Q    (By Mr. Harper)  This document I received on Friday.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 111

1    A    Yeah; that was provided to me.

2    Q    If you could go to NANCE 22, at the bottom of the

3         page.

4    A    Mm-hm.

5    Q    It says:  What could have been done back in 2004?

6         Stronger worded messages with penalties for

7         noncompliance; more timely - no reason to wait so

8         long; messages to pilots, to maintenance, to flight

9         attendants, to contractors who provide workers with

10        access to the cockpit (ramp, caterers, cleaners);

11        review and utilize information in maintenance logs -

12        set up system to have data gathered to isolate planes,

13        locale, recognize it is only on 737's; Hinkle and

14        Wallitner gave up to quickly on deciding unable to

15        trace/track; get expert assistance; and then the last

16        one is do a sweep of 737 cockpits.

17             Do you see that?

18    A    Yes.  And I've gone beyond that in a couple of places,

19        of course, but I thought that fairly well framed the

20        issues that needed to be dealt with.

21    Q    And these are issues that you assumed were true as a

22        part of -- as a part of your analysis?

23    A    Well, they were -- they were issues.  I mean, we'd

24        have to take each one point by point.  But again,

25        unless I saw, in the information provided to me,

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 112

1       something that inherently discounted or seemed to

2       contradict a principal element of the assumptions

3       being made, what I was dealing with here, as you can

4       clearly see from my report, is the overall influences

5       that are laid out by this and by the other evidence.

6               My -- my purpose here was not to come in and

7       basically do the jury's job for them on fact. My --

8       my analysis here is useful, I think, from my years of

9       experience dealing with what impacts and what does not

10      impact safety and how an airline runs and how we ran

11      it then and how we should run it now.

12  Q   What does -- what does safety have to do with this

13      case?

14  A   Everything.

15  Q   Why is that?

16  A   An upset pilot, regardless of how that pilot got

17      upset, is less capable of rising to the standard the

18      public expects of air safety than a pilot who is not

19      upset.

20              To the extent that an airline with the operational

21      authority and the responsibility, under FAR Part 121,

22      has knowledge of or control of anything that would add

23      to the upset of that or any other pilot, they have an

24      affirmative, an inescapable obligation, based on what

25      we have learned in the previous 20 years, to interdict

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 113

1   that immediately, whether the problem is something
2   that they created or something they are responding to.
3        In this instance, clearly we have an individual
4   who, as a good captain with a good record, was upset
5   by things that were found in the cockpit, and further
6   upset -- and had every reason to be, in my view -- by
7   a tepid and, quite frankly, wholly ineffectual -- I
8   believe I used my word in that report -- response from
9   the company.
10       And over time, before even perceiving that she was
11  being attacked, the fact was that she was flying in a
12  condition that was less than that that should have
13  been, and the company had a responsibility to support
14  her in curing the problem.
15       They did not do this.  They did not rise to the
16  level that they should have risen to.  And on top of
17  that, because of horizontal hostility, they turned
18  around and attacked the reporter, which is a classic
19  mistake.
20  Q  It's your opinion that the company did not meet their
21     duty in this instance?
22  A  Clearly.
23       And let me -- well, I'm not lecturing.  Sorry.
24  Q  I think you said this before, but just to clarify --
25     and I'm going to turn now to your report, which is

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 122

1    cite you a recent accident -- as a matter of fact, the

2    only one in the past seven years --

3                    THE REPORTER:  Slow down.

4                    THE WITNESS:  Sorry.

5    Q    (By Mr. Harper)  If we can -- I prefer not to get into

6    the example.

7    A    Sure.

8    Q    The next thing you say is, "We can rail at the pilot

9    all we want about 'bucking up' or 'having a tougher

10   skin' or even using the old military approach of

11   'that's only a personal problem, lieutenant,' but the

12   resulting state of distraction is seldom responsive to

13   such methods, whether such exhortations appeal to the

14   professional machismo of a pilot (male or female), or

15   whether they become a taunt."

16   A    Mm-hm.

17                    THE REPORTER: Whether they

18   become...?

19                    MR. HARPER:  A taunt.

20                    THE WITNESS:  T-A-U-N-T.

21   Q    (By Mr. Harper)  You wrote that; correct?

22   A    I did.

23   Q    And what's your basis for saying that?

24   A    Well, my entire history in aviation safety, for one

25   thing.  And again, I would cite all those experts who

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 123

1    would agree with me 100 percent without reservation.

2        The fact is that while we sometimes act like we

3    can just put it all aside, we have drilled many a hole

4    in many a mountain with an airplane piloted by

5    somebody who thought they could compartmentalize that

6    stuff, and they can't.  We know this.

7        We have found this out in Air Force safety the

8    hard way.  I'm not sure we've completely learned the

9    lesson, but we know that it is a squadron commander's

10   absolute responsibility not to let people near those

11   jets if they -- if there's any reason to believe that

12   they are within that realm of all those things that

13   I -- that I cited to you.

14   Q   Is there any research that you can cite on this issue

15       that the resulting state of distraction is not

16       responsive to such methods?

17   A   If you want -- if you want to compensate me for

18       getting back in and writing you another paper, I'll

19       find you the research.  It's there.

20           Do I have it today?  No.  This was not the scope

21       of what I was here to talk about.

22   Q   Did you do any of that research in preparation for

23       this report?

24   A   In preparation for the report?  No.  Over 25 to 30

25       years, yes.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 124

1    Q    Can you tell me today what research you relied upon in
2         coming to this conclusion?
3    A    Well, again, I'll go through the list, if you like.
4            Dr. Bob Helmrich, University of Texas --
5    Q    Just take them one at a time.  What did Mr.
6         Helmrich --
7    A    Mr. Helmrich, for about 15 years now -- for about 15
8         years now, is a full professor, tenured at the
9         University of Texas, has worked in human factors
10        specifically in regard to aviation and the airline
11        business.  He has validated literally every one of the
12        points that I've made here, many times over.
13   Q    When you say every single one of the points you've
14        made, every single point in your report?
15   A    My belief is that if I presented this report to Bob,
16        he would give me an A+, so to speak, and would not
17        mark anything off or change anything of substance.
18            I believe I am basically correctly portraying to
19        you the body of research and understanding throughout
20        the aviation industry, that even United Airlines has
21        contributed to in past years, in regard to the fact
22        that you cannot order a pilot not to be distracted any
23        more than you can order a doctor not to be distracted.
24            We have the -- the essence -- the essence of the
25        human factors revolution that has led us to such a

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 125

1    success is understanding that you can't discount these

2    things.  You know, it's almost like at this stage of

3    our development of this, it's almost like asking,

4    well, do you have a paper to prove the sun is up at

5    noon?  No.  Res ipsa loquitur.  It's clearly up at

6    noon.

7        So I would cite you to Helmrich work.  I would

8    cite you to Dr. John Lauber and most of the things

9    that he produced at the NASA Research Center at AIMS

10   before he moved on to become one of the board members

11   of the National Transportation Safety Board.

12       I would cite to you most of the work on human

13   factors --

14   Q   You need to slow down a little bit.

15   A   I'm sorry.

16       -- most of the work on human factors done in

17   England by Dr. James Reason.  And certainly they're

18   just a -- there's a galaxy of other people, whose

19   names in any of the human factors on CRM, Crew

20   Resource Management, books would be readily apparent.

21   I mean, this is a community that's been developing

22   since 1983.

23       Dr. Alan Diehl, D-I-E-H-L, for instance, formerly

24   of the FAA, formally of the NTSB, 15 years as the

25   senior scientist at the Air Force Safety Center in

John J. Nance
11/3/08

92

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 126

1    Albuquerque, you know, we're in lockstep on these same

2    things.

3        As a matter of fact, his book, Silent Knights,

4    K-N-I-G-H-T-S, probably is the definitive work on

5    underscoring the fact that the military went down the

6    wrong road -- Navy, Air Force, Marines, and Army -- in

7    attempting to get past this reality by simply ordering

8    people to not feel what they felt.

9    Q  The next sentence you have in your report states,

10       "Pilots as a breed are fairly good at

11       compartmentalizing certain upsets in their personal

12       lives."

13   A  That's true.

14   Q  Do you see that?

15   A  That's true, yes.

16   Q  What's your basis for saying that?

17   A  Yeah.  Well, let's see.  I did four -- no, three

18      different major video productions for the Air Force

19      during the '90s, that some still are in use, that went

20      into this and cited, again, many of the sources that I

21      just cited to you, especially Alan Diehl, Dr. Diehl.

22      And the fact was, and is, that our ability to -- as a

23      matter of fact, there was even a guy -- I'm trying to

24      remember his name -- who taught this for the Navy.  He

25      taught it to Navy wives and later to the Air Force,

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 127

1    and he taught it to us.  And that was that our

2    compartmentalization ruined relationships if the other

3    part of the relationship was not aware of what was

4    happening.

5         We tend to do this with mission orientation, but

6    we do not do it successfully -- and I don't think any

7    human does -- when it's something that impedes on the

8    mission at hand.

9         And let me explain this as best I can.

10   Q    Can I just take a second --

11   A    Yeah.

12   Q    -- and walk you through it a little bit?

13        You say that "pilots as a breed."  Is this

14   something that pilots are born with?

15   A    No, they're not born with it.  No.  We're -- you could

16   argue a nature or nurture argument, that people who

17   have these traits more often gravitate to pilot

18   positions.  I would say we could probably blow that

19   one out of the tub.

20        And I think pilots by training learn -- for

21   instance, if I -- if you were a pilot and professional

22   and I were to pop a paper bag behind your head at a

23   critical point in flight, if you're good, you won't

24   even flinch.

25        Most of us would flinch.  We're good at

John J. Nance
11/3/08

94

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 128

1    concentrating on a mission-orientated basis on the job

2    at hand.

3        But here's the point.  And this is important.

4    It's really important.  And that is that if it's an

5    upset with the wife or the significant other, the

6    husband, and a pilot then goes out and flies, that we

7    can do a fairly good job of compartmentalizing,

8    because now we're focusing on this important mission,

9    important in our eyes, of flying.

10       But if the distraction and the upset is within

11   that box of our professional activity, we can't do it.

12   We don't do it well at all, because it's all involved.

13   Everywhere we look, there's something to remind us of

14   that upset.

15       And that's where people go wrong.  And I think

16   Dr. Jim Reason even said this -- I think it was Jim;

17   it could have been Bob Helmrich -- but he said, you

18   know, we make a mistake in thinking, gee, we're good

19   at compartmentalizing, but not if it's in that same

20   realm.

21       So a pilot to compartmentalize an upset that

22   breeds from the level of employment or from the

23   employment is not going to be successful.

24  Q   Have you done any research personally concerning

25      whether pilots are good at compartmentalizing upsets?

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 129

1    A    Yeah.  As an author, I think I've done a lot.  When I

2         was researching Blind Trust, 1984 and '85, I was -- I

3         was so deep into this, it took me a year and a half,

4         and that was one of the areas that specifically I got

5         into, because we had had training in

6         compartmentalization in the military.  And I realized

7         by talking to a lot of folks, we couldn't do it if the

8         upset was with the company.

9    Q    How many pilots did you talk to?

10   A    Oh, that research is 20 years old.  I couldn't tell

11        you.

12             I probably, over the course of that research,

13        interviewed at least a hundred people.  And 1 think I

14        have something like 400 hours of little cassette

15        tapes.  It was a prodigious job.

16   Q    Your next sentence says, "Even those who appear to be

17        able to suppress an upset/distraction emanating from

18        their personal life are often fooling themselves,

19        since the underlying upset is still cooking away

20        beneath the facade of normalcy."

21   A    Absolutely.

22   Q    What's your basis for saying that?

23   A    Same thing.  I cite all the examples that I cited to

24        you in the research I cited to you.

25   Q    If you could just --

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 130

1    A    This is axiomatic.

2    Q    It's axiomatic in what way?

3    A    Well, all right.  It's -- again, it's like saying, all

4         right, if you don't believe the sun is up at noon,

5         until I give you three astrophysicists with reviewed

6         papers, then fine.  But the fact is, you'll find no

7         one who is an expert in this area who would not agree

8         with me a hundred percent.

9             And here's the reason why:  In dealing with what

10        we had to deal with in trying to realize that human

11        failure depended in many cases on distraction in the

12        cockpit and upsets and fatigue, we had to also drop

13        our resistance to the facades that we as pilots

14        especially, and researchers, too, from academia, had

15        always put up that, well, I'm a special breed, I can

16        handle that fatigue, I can handle that distraction.

17            In dealing with this in the Air Force in

18        particular, it was very obvious -- and Dr. Alan Diehl

19        has written on this too; not in that book, but in

20        other papers -- that a pilot or anybody who is in a

21        critical, you know, a pointed -- what do we call

22        it? -- a sharp end enterprise, who is in a world that

23        we used to have where machismo or the appearance

24        thereof was important, would always say, no, I can

25        handle it.  But in many, many cases, some of the --

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 131

1      not some -- many of the accidents that we have had in

2      the Air Force especially, both in peacetime and in

3      wartime -- we hurt ourselves more than the enemy hurts

4      us in wartime -- have been traceable to upsets that

5      somebody in the squadron knew were there.  The guy was

6      good at -- usually a guy -- was good at

7      compartmentalizing, or so we thought, but in fact the

8      distraction bubbled over and some major mistake was

9      made in one form or another.

10          The fighter community took a long time to

11     understand this.  I think they are thoroughly

12     inculcated with it now.  Navy included.

13   Q   Is there anything that a pilot does that is not

14     related to safety?

15   A   In the cockpit you mean?

16   Q   Yes.

17   A   Well, I could probably find you a solid connection

18     with safety on anything and everything that goes on in

19     the cockpit in flight.  Even going to the bathroom.

20     But, I mean, it's all a matter of varying degree.

21          You're -- you're in a machine that's about 99.99

22     percent reliable.  Maybe a lot more 9's than that.

23     But if something goes wrong, we need you alert and

24     here now instantaneously.  And, of course, on descent

25     and ascent, there are an awful lot of interactions

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 132

1     that require constant concentration.

2   Q   Do you have an opinion of whether Captain Stout

3       believed that the pornography on the flight deck was a

4       safety issue?

5   A   You know, frankly, I consider that immaterial.  It was

6       a distraction, clearly.  My opinion is that it was

7       clearly a distraction to her and that it was upsetting

8       to her.

9   Q   Do you have an opinion about whether she believed it

10      was a safety issue?

11  A   Whether she, as past tense, ever looked at that and

12      said this is a safety issue?  Yeah, I believe she did.

13  Q   And what do you base --

14  A   I'm not sure she could have articulated it with the

15      degree of connection that I have, because she hadn't

16      worked in that area.  But I believe that she

17      understood it to be.

18  Q   What do you base that on?

19  A   Well, you asked me a question.  I'm giving you my

20      opinion.  I base it on everything that I've read.

21  Q   Anything in particular you can point to?

22  A   If I were to go back through every deposition, I could

23      probably find some things that would validate that

24      opinion.

25          It is an impression, but I consider it immaterial.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 133

1      Clearly she was upset by it.  Clearly she was
2      distracted by it.  And that, in and of itself, is
3      really the only thing necessary.  It does not matter
4      whether she individually, in my view, thought of it as
5      a safety matter or not.  The company is the arbiter of
6      that, and the company had the responsibility, dammit,
7      to understand this.
8          And that's why I'm so disappointed in United.
9      Come on.  Out of all the airlines out there, they know
10     better than this.  Shame on them.
11                     MS. VREELAND:  Counsel, it's past
12     noon.  Are you going to -- depending on how long you
13     intend to be, do you want to take lunch now?  What do
14     you want to do?
15                     MR. HARPER:  Let me ask just a few
16     more questions to wrap this up, and then we can take
17     lunch.
18  Q    (By Mr. Harper)  Do you have an opinion as to whether
19     the pornography created a hostile work environment for
20     Captain Stout?
21  A    Oh, yes.
22                     MS. VREELAND:  Objection to form.
23  A    Obviously, like you, I'm a male.  I have daughters.
24     And so I try to extrapolate of what a female would
25     think.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 134

1          I know of no female, in my experience, who is not
2      offended by having to be in the same position as --
3      or, you know, in the same place as other males and be
4      confronted with pornography.
5          In some instances, it's very, very upsetting.  And
6      so do I have an opinion as to whether she -- I believe
7      your question was, was upset and distracted by that?
8      Is that what you asked?
9   Q  Whether it created hostile work environment.
10  A  Hostile work environment.  That's it.  Thank you.
11     Sorry.
12         Yes, clearly.  Clearly.  This is the intent of our
13     federal laws, and this is the intent of our public
14     policy.  And for gosh sakes, you know, A, public trust
15     under Part 121, public policy, all these things,
16     certainly no one would try to argue that this was not
17     clearly a de facto one-to-one, if it offends a woman,
18     it is a hostile work environment.  Especially when she
19     has tried to do something responsible about it and the
20     response has not risen to a level reasonably
21     calculated to solve the problem.
22  Q  On the top of the next page -- and this is the last
23     area I'll go into right now --
24  A  Sure.
25  Q  -- before lunch, the first full paragraph on Page 6 of

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 135

1    your report --

2  A  Okay.

3  Q  -- states, "Across the spectrum of U.S. airlines,

4    these inescapable realities have led to crew

5    schedulers and pilot mangers becoming increasingly

6    aware that forcing, directly or indirectly, an upset

7    (distracted) pilot to fly - or even pressuring such a

8    pilot directly or otherwise is a de facto dangerous

9    act."

10    Do you see that?

11  A  I do.  And I agree.

12  Q  What's your basis for that opinion?

13  A  Well, an awful lot of reports from the National

14    Transportation Safety Board.  And I'm not sure that

15    any of them said, de facto, a dangerous act, but

16    clearly when you have an identified significant

17    element of a causal chain that had to do with forcing

18    pilots or making them think that they were forced to

19    fly or ignoring pleas to be off the trip, there's --

20    there's just no question.  I mean, this, again, is

21    beyond axiomatic.

22    I could cite you to many accidents, including all

23    the way back to 1968, and the beginning Proto report

24    by the NTSB, before they really knew how to do these.

25    The definitive one was probably -- first

John J. Nance
11/3/08

102

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 144

1    A    Well, again, I had said it earlier:  the proper and

2         safe response for an airline, if they suspect somebody

3         is improperly using this, is, you don't hesitate to

4         take them off the trip, but then you talk to them.

5         You do what was apparently not done by anybody here,

6         which is say, you know, Captain, what's -- what's

7         going on?  I mean, this is -- this is two -- two is

8         really inconsequential.  Four to five, yeah, it's time

9         to talk to that person and find out what's going on in

10        your life, what's going on professionally, why are we

11        having a problem.  Are you sick, are you coming apart,

12        is there a family problem.

13             When that's not done and you default to

14        essentially a punitive type of approach, it's not a

15        matter of the company having the right to do that.  I

16        said this in the report.  The company has the right to

17        do that, but it's not a smart thing to do.

18             The smart thing to do is, you know, ring the alarm

19        bell, call her in.  Not in a, you know, I'm going to

20        sit mind my desk and glower at you when you're sitting

21        there as the subject, but let's go out and have a cup

22        of coffee and tell me what's going on.

23             When that isn't done, usually what you see is a

24        default to the punitive.  And that's where I saw this

25        going.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 145

1   Q   What's the source of that duty for the company to act

2       that way?  Why does the company have a duty --

3   A   Public safety.  The safety of the flying public.

4           Anything that the company does that, in any

5       significant way, puts a distracted or upset pilot in a

6       commercial cockpit reduces the margins of safety.

7           And to the extent -- because we already talked

8       about how much is enough and how much is too much.  To

9       the extent that that is a known problem by the company

10      or that they have a punitive responsibility to know

11      that it's a problem, they have an absolute duty not to

12      let that happen.

13  Q   And is it a legal duty?

14  A   I -- quite frankly, I think it goes way beyond that.

15  Q   But is there a legal duty you can point to?

16  A   Is there a legal duty?

17          Given a bit of time to research the premise of the

18      FAR's, I'll bet you that I could say it was a legal

19      duty.

20          Right now, I can't say it's a legal duty, but I

21      can sure say that it's a moral responsibility to the

22      airline; under not only the codes in the Federal

23      Register that let them fly, but also in what they hold

24      themselves out to be to a public.

25          And United is a proud airline.  It's held

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 146

1    themselves out to be a very safe operation.  This

2    compromises that.

3                    MR. HARPER:  All right.  Let's take

4    a break for lunch, and then we'll reconvene.

5                    THE VIDEOGRAPHER:  We're going off

6    record.  The time is 12:22.

7                    (Recess 12:22-1:27 p.m.)

8

9                    THE VIDEOGRAPHER:  We are back on

10   record.  The time is 1:27.

11

12

13                    EXAMINATION (Continuing)

14   BY MR. HARPER:

15   Q   Mr. Nance, have you ever been involved in any matter

16       involving sexual harassment prior to this case?

17   A   No.

18   Q   Have you ever been a defendant in a lawsuit?

19   A   Defendant in a lawsuit?  Well, a counterclaim, yes.

20       I'm trying to remember when it was -- well, two.  One,

21       an aviation case back in 1984; and, one, a

22       counterclaim on a suit that we just mutually dismissed

23       a couple of years ago for a company called Canon Air

24       that had fouled up a repair on my airplane.

25   Q   And you had sued them for --

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 147

1    A    I had sued them for --

2    Q    -- for damages?

3    A    -- $70,000 for botching an installation for an auto

4         pilot and taking a year and a half, where they had

5         agreed to take three weeks.

6    Q    And the 1984 case was what?

7    A    '84 case was Tide Air, Incorporated.  And they had

8         damage to an airplane that they alleged I caused,

9         which I didn't, and we won that suit.

10   Q    Was that a plane that had been piloting?

11   A    Yeah.  One I rented.

12   Q    And where was that case?

13   A    That was Tacoma, Washington.

14   Q    Were you deposed in that case?

15   A    I'm sure I was.  It's a long time ago.

16   Q    And it went to trial?

17   A    Yeah, it did go to trial.  They lost at trial.

18   Q    Have you ever acted as an expert on issues involving

19        Crew Resource Management, prior to this case?

20   A    Yes.  In fact, I think the majority of the cases, the

21        one I cited to you for Providence Hospital, a lot of

22        what I was dealing with there was essentially Crew

23        Resource Management and a broader range of that.  In

24        other words, not just CRM in the cockpit, but the

25        effects on safety of certain things that the

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 157

1    upsetting to her.

2         And I do not live in a vacuum or on another

3    planet.  Consequently, I'm well aware that female

4    pilots have in the past, and probably will be in the

5    future, highly offended and upset by such things

6    beyond what maybe their male counterparts would be.

7         Now, as far as research and materials, my

8    knowledge also included that of the previous case that

9    I cited at Alaska Airlines.  And beyond that, there

10   are no papers to cite to you.

11   Q    Did you form an opinion as to whether the pornography

12        interfered with Captain Stout's job?

13   A    I believe I've said very clearly that, as -- to the

14        degree that it affected her, it, thus, affected her

15        performance, degrading in some degree.  And,

16        therefore, affected her job and her ability to

17        operate.  It's a -- it's an immutable connection.

18   Q    You said to the extent it affected her.  Do you form

19        an opinion as to whether, in fact, the pornography in

20        this case affected Captain Stout?

21   A    Do I have an opinion as to whether it affected her?

22        Based on the record presented to me, I certainly do.

23        And the opinion is that it most definitely did.  And,

24        therefore, rose above the threshold of a minimal

25        safety issue, to a significant safety issue.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 158

1    Q    And when you're referring in this sentence that we're

2         talking about, to a female pilot, are you specifically

3         referring to Captain Stout?

4    A    I'm referring to both Captain Stout and any other

5         female who would be probably possessed of a higher

6         potential for being offended by parts of the female

7         genitalia than others in her cockpit.  Just as I said

8         earlier, I would probably be offended by certain

9         counterparts of the male anatomy in the cockpit, if it

10        was a continuous thing.

11            So on the record of what was presented to me, my

12        opinion is, yes, certainly she was affected.

13            And did I miss your question?  I'm sorry if I did.

14   Q    The question -- well, the question now is:  What's

15        your basis for stating that female pilots are

16        generally offended by sexually explicit images?

17   A    Well, I would say common sense.  Direct experience

18        through the case at Alaska Airlines, knowing that lady

19        and how devastated she was.  And knowing -- having had

20        both daughters and association with a wife over time,

21        that I -- I think it's pretty much beyond self-

22        evident.

23                    MS. VREELAND:  I want to object to

24        the form of Counsel's question.  It misstated the

25        written opinion.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 159

1   Q   (By Mr. Harper)  You say on Page 7 of your report, "we

2       cannot allow any degradation whatsoever without

3       risking a decline in overall flight safety."

4                    MS. VREELAND:  I'm sorry, where are

5       you pointing?

6                    THE WITNESS:  Fourth line down.

7   Q   (By Mr. Harper)  What does that mean?

8   A   Let's take the sentence in context.  "This is a safety

9       issue, and considering the very important fact that

10      the almost perfect level of commercial aviation

11      safety" --

12                 MS. VREELAND:  Slow down.

13                 THE WITNESS:  All right.

14   A   -- "is built on a precarious orchestration of

15      mechanical and human balances and safety values, we

16      cannot allow any degradation whatsoever without

17      risking a decline in overall flight safety."

18       Now, in brief, what I mean by that is, I cited to

19      you the fact that we've gone seven years with only one

20      accident.  We don't know how far back we can go.  In

21      other words, we don't know how many things we can take

22      out that we have learned to do, before we start seeing

23      an increase in accidents.  So, therefore, in the

24      interest of public safety, we have to assume that we

25      can't take any of them out.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 164

1       extension of the company, you know, under respondeat

2       superior, this would certainly be held.

3           I think the duty is very clear that you would --

4       you would not, you know, as I say, go unbolting

5       panels, but you would look to the extent that it was

6       reasonable to do so, because if somebody has put in it

7       a couple of places, they've probably gone as far as

8       they could go.

9           Consequently, just finding one, throwing it away,

10      going on, your high likelihood you're going to be

11      subjecting somebody else to it later on.

12  Q   Does that arise in part from United Airlines's zero

13      tolerance policy?

14  A   I think it arises from zero tolerance.  I think --

15      their policy.  I think it arises from federal law.  I

16      think it arises from -- from basically tort.  And I

17      think it arises from just pure decency and the

18      responsibility of the captain.

19          You know, it's no mystery that this is going to be

20      offensive to some people, and you don't know who.  And

21      consequently, you make -- you shouldn't make that

22      assumption.

23  Q   You say at the bottom of the page, "a captain is

24      honor-bound to take extra steps to assure the cockpit

25      is clean of such material."

John J. Nance
11/3/08

110

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 165

1   A   I think that's consistent with what I've said, yes.

2   Q   And what do you mean by "honor-bound"?

3   A   Well, responsibility -- I don't want to do a
4       dissertation here, and you don't want me to.

5           Any leader in a position of controlling something
6       that could cause great harm has more than just the
7       letter of the law or the regulations to consider.

8           Honor dictates that they consider their actions.
9       Even the law of tort considers that.  But it's beyond
10      it.

11          An airline captain, for instance, God forbid,
12      devoid of engines, in a terrible circumstance, having
13      to put an airline in somewhere short of a runway, is
14      very likely -- I would hope all of us would -- going
15      to try to find a way not to hurt any more people than
16      they absolutely have to.  That's honor.  That has to
17      do with your duty to humanity.

18          And I think this on a smaller scale, but still a
19      significant one, comes within that realm.

20  Q   If Captain Stout felt that the pornography was a
21      distraction, did she have a duty to remove it before
22      takeoff?

23  A   If she thought it was a distraction?  As such to, in
24      flight, yes.  But I think the duty to remove it would
25      be where it was found and where it might be found at

John J. Nance
11/3/08

111

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 166

1    any time that it was -- she had the ability to.

2        She's in control of the airplane.  It's when she

3    relinquishes control of the airplane that the stuff

4    should no longer be there one way or another.

5        I would want to do it, in most cases, before

6    departure.

7    Q   Why would you want to do it before departure?

8    A   Well, I'd like to get it on the record right then and

9    there, because if there is a pattern to this, the

10   record needs to be made as to when this was occurring,

11   where this was occurring, because that would be the

12   best ability to track back who was doing it over time.

13       So to do it on the other end, I would assume

14   acceptable, but it would be better to do it before

15   departure.

16   Q   If a captain doesn't look for it pre-departure and

17   then does look for it during the course of the flight,

18   does that raise any concerns with you?

19   A   No.  No, not -- again, the concern with me would be

20   whether or not that duty was discharged before that

21   captain relinquished control of the airplane.

22   Q   Is there a concern that looking at distracting

23   material while the plane is in flight is less safe

24   than doing it before the plane takes off?

25   A   Not unless it's involved in takeoff and landing or

John J. Nance
11/3/08

Byers & Anderson
Court Reporters & Video

Page 167

1    climb or descent.  But at altitude, no.  It's really

2    reflected in the Federal Air Regulations, we don't

3    extend the sterile cockpit rule above 10,000 feet.

4        Now, were a captain to be searching around at

5    critical places in flight, that would be another

6    matter.

7    Q    You say on Page 8, the first full paragraph, that

8         "finding sexually explicit materials that are strictly

9         forbidden by company policy, and with the requirement

10        to understand that such materials may form a safety of

11        flight problem if discovered by other pilots in the

12        course of their duty, reasonably requires at least

13        documentation of the discovery."

14            Do you see that?

15   A    Yes, I do.

16                  MS. VREELAND:  You want to read the

17       entire sentence, Counsel?

18   Q    (By Mr. Harper)  The end of it says, "even in the

19        absence of a specific company procedure to do so."

20            What's your basis for saying that?

21   A    Well, let's see here.

22   Q    Let me -- I can be more specific in my question.

23   A    Please.  Yeah.

24   Q    What's your basic -- basis for saying that there is a

25        duty to document the discovery of sexually explicit

John J. Nance
11/3/08

113

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 183

1    has to be done, most of them are going to do it.

2        But to get it done instantly, get everybody's

3    attention, you've got to be very clear what the

4    consequences are.

5  Q  Why would mechanics need a clearer statement of what

6    will happen if a rule is not followed?

7  A  Well, the culture is a little bit different.  You

8    can't be an airline pilot without being a college

9    graduate.  There's no such requirement for a -- for a

10   mechanic.

11       And it's just like when I'm advising people in the

12   industrial world on how to do communications, the one

13   thing I say is, unless you're hiring professional

14   writers, you can't expect a certain level of

15   communication out of people who are not trained for

16   that level.

17       So mechanics, hardworking, concentrated people,

18   but at times, you've got to use a -- not coarse, but

19   you've got a use a more direct method of saying, if

20   you do this, these are the consequential steps that

21   will occur.

22       I -- I personally think it's a result of the

23   differentiation between the levels of education

24   required for those different positions.

25  Q  Are people with college educations better at following

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 184

1       rules?

2    A   I think in the -- in the instance of the airline

3        business, they are.  And part of that is because of

4        how hard you have to fight to become an airline pilot.

5        It's a very tough battle.  And to be a mechanic is

6        difficult and demanding, but nothing like becoming an

7        airline pilot.

8    Q   What's your basis for saying that people with higher

9        educations are more likely to follow rules?

10                   MS. VREELAND:  Object to the form.

11       Misstates his testimony.

12   A   My experience over an entire career validates that, in

13       everything I've seen and heard.  The more education

14       you have, the more interaction with levels of nuance

15       and sophistication in high-reliability organizations

16       that are also high risk, the more you realize that

17       your responsibility is to be very careful to stay in

18       the centerline.  And I think that's rather -- rather

19       more than those who had not had that experience.

20   Q   (By Mr. Harper)  Is it true that for pilots, the use

21       of the word "termination," especially if the word

22       "immediate" is attached, is all that's needed to cause

23       all but the most fool hearty pilot to stop --

24                   THE REPORTER:  You lost me.

25                   MR. HARPER:  Sure.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 185

1          THE REPORTER:  "Especially if the
2     word 'immediate' is attached, is all" --
3  Q   (By Mr. Harper)  -- is all that's needed to cause all
4     but the most foolhardy pilot to stop whatever the
5     company is ordering stopped.
6  A   Absolutely.  If on the eve of taking the bar exam, you
7     had been told, You do this and the bar isn't even
8     going to consider you, after all you've put into law
9     school -- which is a common experience with the two of
10    us -- you're not going to do it, whatever it is.  Not
11    unless you're foolhardy.
12        Pilots are exactly the same way.
13 Q   Are there some foolhardy pilots that, you know,
14    wouldn't be affected by such language?
15 A   There are precious few.  And usually the process weeds
16    these people out early on.  A couple of check rides, a
17    couple of years in the saddle in a subordinate
18    position, and we pretty much know who they are.  And
19    they don't -- they don't last.
20        Can they slip through?  Yeah.  It's very unlikely
21    these days.
22 Q   Is it your opinion that a college-educated pilot
23    wouldn't understand that inappropriate materials
24    included pornography?
25 A   That is exactly my opinion.  If you are talking about

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 212

1    what the receiver heard and you look at the reactions.

2    Q    (By Mr. Harper)    In terms of Captain Wallitner, do you

3    make any assumption or do you come to any conclusion

4    about whether she intentionally treated Captain Stout

5    in a cold manner?

6    A    I think she -- first of all, it's immaterial.    But --

7    in one respect, but I will answer the question.

8         I don't believe that she or anybody else intended

9    the effect that they had, but I think, as I said

10   earlier, that these were frustrated people who didn't

11   know what else to do.    And in horizontal hostility,

12   the first thing you see is somebody striking back at a

13   reporter.

14   Q    So despite the fact that Captain Wallitner, Captain

15   Durgan, who we've discussed earlier, didn't intend to

16   cause harm to Captain Stout --

17   A    I didn't say they didn't intend to cause harm to

18   Captain Stout.    I said that they didn't intend to have

19   her interpret whatever message they were verbally

20   sending as she may have interpreted.

21        Causing harm is something entirely different.    1

22   didn't address that.

23   Q    Well, do you have any opinion on that?

24   A    Whether the company caused harm to her?

25   Q    Whether the --

John J. Nance
11/3/08

117

Byers & Anderson
Court Reporters & Video

Page 213

1   A   The company destroyed her career.

2   Q   You think the company intended to do that?

3   A   The company, by negligence and by clear violation to

4       some of the very principles that this company in fact

5       helped pioneer, destroyed this woman's career,

6       egregiously and outrageously.

7   Q   Do you think Captain Wallitner intended harm to

8       Captain Stout?

9   A   I don't think that she intended harm.  At least I

10      don't see any evidence on the -- on the face of it,

11      that she intended harm.  I do see evidence that she

12      was frustrated.  "I can't seem to get this closed,"

13      she said, or words the that effect.

14  Q   Do you think that Captain Durgan intended harm to

15      Captain Stout?

16  A   Oh, I think he was equally frustrated.

17  Q   Do you think any other employee of United intended

18      harm to Captain Stout?

19                  MS. VREELAND:  Object to the form.

20  A   Yeah, I mean, how far do you want to go?

21      I don't think anybody intended to harm her, but

22      you well know that the essence of negligence is not

23      the intent to harm.  The essence of negligence is

24      whether somebody did something that they -- they had a

25      responsibility not to do.  And in this case, that's

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 214

1    exactly right.  This company knew better.

2    Q    (By Mr. Harper)  Okay.  Do you think any employee at

3    United intended to retaliate against Captain Stout?

4                   MS. VREELAND:  Object to the form.

5    Exceeds the scope.

6    A    Yeah, I've already covered this ground many times.

7         The essence of what happened was retaliation.  It

8    does not require the mental intent to retaliate.  All

9    it requires is horizontal hostility and the exact

10   situation that we had here:  somebody won't shut up,

11   they continue to be an irritant, you're in a

12   management position, you can't do anything about it,

13   you give up going higher, and you start getting angry

14   at the person who is reporting.

15        It's a classic case.

16   Q    (By Mr. Harper)  If you could just answer my question

17   as best you can.

18        Do you believe or do you have any evidence that

19   anyone intended to retaliate -- and as I understand

20   what you're saying in terms of it's immaterial to your

21   conclusion -- but do you believe that anyone intended

22   to retaliate against Captain Stout?

23   A    I --

24                   MS. VREELAND:  I object to the form.

25   Outside the scope of the opinions requested.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 215

1   A    And I really can't answer that.  And I'll tell you why
2        as briefly as I possibly can.
3            When you say intended to retaliate, people may
4        intend to do one thing and it has the essence of
5        another.
6            The intention, I can't answer.  I can't answer.  I
7        don't think that it was necessary to find a mental
8        intent of retaliation to find the essence of that, in
9        effect.  And that's the best I can do for you.
10  Q    (By Mr. Harper)  You've used this term "lateral
11       violence" or "horizontal violence"?
12  A    Horizontal hostility, yeah.
13  Q    Okay.  You also used the term "lateral violence" in
14       your report.
15  A    Mm-hm.
16  Q    Is that the same thing as horizontal hostility?
17  A    Yes, it is.  And I'm sorry to be using both of them.
18           There's a very good book by Kathleen Bartholomew
19       called Ending Nurse to Nurse Hostility.  And that's
20       where it comes from.  Ending Nurse to Nurse Hostility.
21  Q    What does lateral violence mean?
22  A    Lateral violence, in an organization with multiple
23       levels of management, means that people are attacking
24       each other at the same level.
25           So, for instance, if you had a flight manager in

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 216

1      Chicago attacking a flight manager in Dallas, that
2      would be lateral violence.  And the attack doesn't
3      have to be physical.  It can be -- it can be very
4      subtle.
5   Q  What's the evidence of lateral violence in this case?
6   A  Again, we have a pilot who reports a problem.  We have
7      a company response that is, to be charitable,
8      confused, uncertain, and tepid.  And we have -- after
9      apparently no disciplinary problems, no problems with
10     this individual as a pilot, suddenly she's becoming a
11     problem as a pilot and people are turning on her in
12     one form or another.
13         And under the principles that -- again, I know so
14     well on this, when you have people who feel powerless
15     at a certain level, they're going to strike back at
16     whatever it is they wish would stop.  And when you
17     cannot do anything about this, as these managers
18     obviously could not, her continuous reports were an
19     irritant.  She became an irritant.  Thus, she became a
20     target.
21         You know, you can paint it 16 ways from Sunday,
22     but it's still the same thing.
23  Q  What's the scientific basis for the vesteria
24     (phonetic) of lateral violence?
25  A  It's basically from the oppression theory, which comes

John J. Nance
11/3/08

121

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 236

1    impact the operation, just as I said consistently.

2  Q   What's your basis for saying that virtually anything

3      inserted in a pilot personnel file is considered a

4      direct and serious threat to the pilot's career?

5  A   With all due respect, I think we covered this early

6      on.  Do you really want to go back over it again?

7  Q   If you could just tell me the basis, I'd appreciate

8      it.

9  A   All right.

10      Every airline pilot -- and we've all struggled

11     hard to get to that point -- knows well, whether

12     you're in a union or nonunion environment, that that

13     folder, of whatever form it takes, once somebody's put

14     something in there, it is -- can be the beginning of a

15     slide towards termination.  It can begin to be the

16     seeding of a record.

17      There's that reality, coupled with the reality

18     that it is so unusual to put a derogatory piece of

19     paper in somebody's file, even if it's going to be

20     yanked in three to six months, that it is a massive

21     assault on that pilot, and it is taken that way.

22      So on both counts, that is a very serious matter.

23     And any management pilot who would say that it is not

24     is, as I think I said, either being disingenuous or

25     very naive.

John J. Nance
11/3/08

Byers & Anderson
Court Reporters & Video

Page 237

1   Q   Do you know how often United pilots received letters
2       of counsel in their file?
3   A   I'm aware only that it's a very rare event.
4   Q   How do you know that?
5   A   From friends.  Just the same -- you know, over the
6       years, we talk and compare notes.
7           And on top of that, in the Airline Pilots
8       Association, we have most of the major airlines, with
9       the exception of American, as members.  And we
10      exchange information constantly about what goes on.
11          And I can tell you that that is a very hot-button
12      union thing, as far as letters in the file.
13      They're -- that's a part of negotiations in many cases
14      for the contract.
15  Q   Are you still a member of ALPA?
16  A   You know, I guess I am.  I think I'm a lifetime
17      member.  I still get the magazine.  I don't pay them
18      any dues.
19  Q   How many people did you talk to, to find out how often
20      United pilots get letters of counsel in their file?
21  A   Counselor, I just --
22              MS. VREELAND:  Object to the form.
23  A   I just answered that.  I told you that it's over time.
24  Q   (By Mr. Harper)  I asked how many.  How many people
25      have you talked to?

John J. Nance
11/3/08

123

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 238

1    A    How many?  I couldn't quantify it.  A bunch.

2         I flew with an awful lot of United guys, and

3    through ALPA.  We were constantly exchanging

4    information.

5    Q    And you're talking about letters of counsel?

6    A    Letters of counsel, letters of reprimand, letters of

7    intent.  There's a variety of things that can go in a

8    file.  Anything -- repeat:  anything -- put in a

9    pilot's file that is not a complimentary letter is a

10   direct and binary threat.

11   Q    Do you believe that there are any other explanations

12   for the increase in safety in the last several years

13   in the airline industry, other than the institution of

14   CRM?

15   A    Well, let me make it clear, it's not just CRM.  It's

16   the entire panoply of human factors awareness, the

17   revolution that we went through.  CRM is an interval

18   spark point and starting point.

19        Of course we have had some other improvements.

20   We, for instance, have approved the Ground Proximity

21   Warning to the --

22                  THE REPORTER:  The what proximity?

23   A    Ground Proximity Warning System, with a version called

24   Enhanced Ground Proximity, which has been one of the

25   few wins where a black box really did solve a problem,

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 239

1  which was controlled flight into terrain.  It comes

2  from a very brilliant guy here in town who thought

3  that up.

4      We have, through TCAS -- that is Traffic Collision

5  Avoidance System -- even though it's not doing

6  everything it should, it has probably saved half a

7  dozen major accidents just in the past five years.

8  It's certainly given us the ability to avoid air

9  traffic controller errors metastasizing into

10  accidents.  So we have had some solid wins in terms of

11  the equipment.

12      But the problems that we were having in the '70s

13  and the '80s, the type of accidents that we were

14  having were not caused by anything that those elements

15  could interdict, with the exception of the ground

16  proximity.

17      And consequently, what we had to look at were

18  the instances of bad communication, misunderstood

19  communication, directives that were misunderstood by

20  the crew; a whole bunch of human things, including the

21  accident that I cited in Dallas.  And those were

22  simply unresponsive to anything else.

23      So when -- when you look at the evidence, it's

24  really startling clear, especially, again, 2001-2008,

25  one accident, the only reasonable explanation is that

John J. Nance
11/3/08

125

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 255

1    think they were so bad that I needed to change them.

2        Unless I'm asked to look at something else and it

3    requires an additional explanation, I don't have any

4    immediate plans to change this.

5  Q  Do you have any far-off plans to change it?

6  A  No, I don't have any plans to change it.  But I

7    reserve the right to do so, as I put in the

8    manuscript, if something else comes to light.

9  Q  Do you anticipate reviewing any additional materials?

10 A  That is a neutral.  If they are given to me, I'll be

11    happy to review them.  If not, I'm not going to seek

12    them out.

13 Q  Do you have any intention of doing additional work on

14    this report?

15 A  Not unless it's requested that I do so.

16 Q  Have you been requested to do any additional work?

17 A  No.  Nope.

18 Q  Are there any authoritative publications in the area

19    of aviation safety?

20 A  Oh, gosh, there are dozens.  I didn't come prepared

21    with citations, but it wouldn't take me long to

22    generate a list.

23        People like Dr. Earl Wiener, W-I-E-N-E-R, at the

24    University of Miami has a book out.  There was a book

25    generated with an article of mine in it back in '86 or

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 256

1    '87, that Northwestern University produced by Oxford

2    University Press, but that was on transportation

3    deregulation, but it also had some of these elements

4    in it, early form in it.

5        Many books have been written on human factors,

6    human performance.  Dr. Jim Reason, James Reason, of

7    Britain has at least two definitive works out.

8        Earl -- or not Earl.  Excuse me.  Dr. Helmrich, I

9    mentioned earlier, has at least one book out, I

10   believe, on the subjects, and many, many papers.

11       I could be wrong about the book.  I know Bob was

12   going to publish one.

13       I mentioned the book by Dr. Alan Diehl.  And

14   again, I just have to go into a bibliography, but

15   there's been a lot of writing done, a lot academically

16   based writing and scientifically based research.

17       In '86, it was tough sitting across from chief

18   financial officers and saying, give me the data.  We

19   didn't have it.  We now have enough to choke a horse.

20   Q   Did you rely on any specific articles or publications

21       in preparing your report?

22   A   No.  This is mostly -- I wouldn't say mostly.  I'd say

23       all of it is just out of my head and my memory of it.

24       I'm so deeply involved, I don't think I even Googled

25       anything.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 257

1    Q    I asked you before whether one incident of pornography
2         on the flight deck would create a safety issue.
3    A    Mm-hm.
4    Q    And what was your response to that?
5    A    My response was:  it certainly could.
6              It depends on the reaction of the individual who
7         finds it.  And that reaction, in my view, is not
8         subject to scrutiny on the basis of, well, you
9         shouldn't let that upset you.
10             In reality, even the most sensitive individual is
11        probably not going to react seriously enough to one
12        instance for that to be a de facto safety hazard at
13        that time.  But with a repetition, the fact that it
14        can become disturbing -- as I say in a previous case
15        involving a female pilot at Alaska Airlines, it not
16        only ended up destroying her career, it destroyed her.
17        And the psychological effects are really indisputable.
18             So it has to be taken on a case-by-case basis.
19        But one instance, I would not point to and say, well,
20        this is a safety hazard.  Multiple instances?  Yeah.
21   Q    Is it fair to say that there -- for some pilots,
22        pornography on the flight deck didn't create a
23        safety -- safety issue?
24   A    That's fair to say.  That's fair to say.  For some
25        pilots, it would not -- hopefully it would be

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 258

1    something that they would take note of and not want
2    around, but -- but it would not necessarily be a
3    reaction.
4        And we have to look at the -- at the sensitivities
5    of different genders and sensitivity of different
6    backgrounds.
7  Q  What's the name of the Alaska Air pilot who you just
8    referenced?
9  A  Captain Jeannie Price, P-R-I-C-E.
10 Q  Did she file a lawsuit at any time against Alaska
11   Airlines?
12 A  I think she did.  I'm not sure.  I was not involved in
13   that aspect of it.
14       My recollection is that there was legal action.
15 Q  Do you know what the result of that legal action was?
16 A  No, I don't.  I know she was a shattered woman.
17 Q  If you could turn to Page 5 of your report.
18 A  Okay.
19 Q  Towards the bottom of the page, the second to last
20   complete sentence, you've written, "both public policy
21   and the policy of most enlightened air carriers - as
22   well as the underlying philosophy of the Federal Air
23   Regulations - is to accept this reality and respond to
24   it officially with an unusually sensitive empathy."
25       Do you see that?

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 259

1  A   Mm-hm.  I do.

2  Q   First of all, who are you referring to when you

3      reference "the most enlightened air carriers"?

4  A   Do you want the names of the individual airlines?

5  Q   Yes.

6  A   Well, I don't think it's possible to give you a

7      definitive list, because some at some times were

8      obviously better than others, including the one who is

9      your client.

10     I think Alaska Airlines has done extraordinarily

11     well.  I think Southwest Airlines has been

12     superlative.

13     I have my doubts that some of the others were as

14     aggressive about understanding these things as they

15     should have been.  And I'm trying to be nice about it.

16     Some of them were disastrous.

17     But as far as a definitive list, you have to take

18     a particular point in time.

19     The point I was making here, and it is entirely

20     valid, is that the cat is out of the bag once and for

21     all.  We know that these elements of upset have an

22     effect on flight safety.  And we know that while the

23     individual effect may not metastasize to an instant

24     accident, it raises the possibility by decreasing the

25     margins of safety.

John J. Nance
11/3/08

130

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 260

1      Ergo, we no longer have what we used to have in

2   aviation:  the ability to say, eh, don't worry about

3   that; it's just a personal problem.  And any

4   plaintiff's attorney who's a handled a major air

5   disaster case knows that very well.

6      The -- the elements that we've been talking about

7   here of human factors, human performance, CRM, all are

8   extremely well-known to that aspect of the bar.  And

9   they use it to beat the living daylights out of

10  airlines when they fail to comply and something

11  happens.

12     So it's an expression here of the fact that we

13  can't go back with what we know now.

14  Q  And the standard to which you would hold airlines is

15     one of unusually sensitive empathy to any issue that

16     their pilots encounter?

17  A  That's right.  That's right.

18  Q  You used the term "elements of upset."  I'm not sure

19     I've heard that before today.  What does that mean?

20  A  It's actually not even a term of art.  But what I

21     meant by that, elements of upset means that there are

22     so many different ways that a human being can become

23     upset enough to be distracted.

24     You know, we always talk about anger,

25  preoccupation, fatigue, upset with relationships of

John J. Nance
11/3/08

131

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 261

1    one sort or another.  But elements of upset would be

2    any of the different things that could get a human

3    being to the point of really not being able to pay as

4    much attention to what they're trying to do as they

5    should.

6         And this does not include, you know, medication or

7    alcohol or anything.

8  Q  What about illness?  Is there any threshold of illness

9    where it's okay to fly versus not okay to fly?

10 A  Well, yes, but that's a very deep subjective problem.

11   And as our aviation medical community will tell you in

12   great detail, our problem there is the need for a

13   certain level of self-diagnosis.

14        A pilot is, as we talked about earlier, by

15   definition, a pretty confident creature.  And you want

16   to perform.  You're mission oriented.  It is sometimes

17   difficult for such people, male and female, to say,

18   you know, I really don't feel good enough to fly,

19   because we're used to toughing it out, especially if

20   you came up through the military.

21        But we have to -- we have to teach and

22   encourage -- and we do for the most part these days --

23   people to do a self-diagnosis and be ready, willing,

24   and able to say, you know, I can't -- I can't put my

25   finger on it, but I really don't feel good and I don't

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Page 285

1    basically, they were unsure -- it's kind of a similar

2    situation -- whether it was mechanics or whether it

3    was pilots or a combination thereof.

4        So they got the vice president of maintenance

5    involved, and he went ballistic, quite properly, and

6    started holding meetings of all his people in the

7    mornings, including putting posters up that said if

8    you get caught anywhere close to any of this, and --

9    you're over the fence.  My words, not theirs.

10        And they started tracing back elements of what

11    shifts were where when these were discovered.  That,

12    as I recall, didn't lead anywhere, except that Dallas

13    as a base was implicated more than anyplace else.

14        But they did a couple of surprise inspections, as

15    I recall, in somebody's -- I don't know if they turned

16    them in or they saw something, and they found these

17    pornographic clips in a couple of mechanics' toolboxes

18    that they had been carrying on and off the airplane.

19    And they fired them immediately.

20        The union basically did the right thing.  They

21    said, well, we will do our statutory defense, but we

22    are not unhappy about getting rid of them.

23        And that -- that finished the problem, as far as

24    maintenance's involvement.  That was the period in --

25    let's see -- '77, I'm pretty sure.  It was right --

John J. Nance
11/3/08

133

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 286

1    I'm just positioning this with some of our campaigns.

2    The 727's.  That was all we had, really, at Braniff.

3   Q   Okay.  Defense counsel made a statement to the effect

4       that:  Isn't it true that you hold the airlines to a

5       standard of unusual sensitive empathy to anything that

6       marginalizes safety.

7           Do you recall that?

8   A   Mm-hm.

9   Q   I want to ask you about the standards that you used in

10      your opinion and report with respect to the steps that

11      United did take in response to Captain Stout's

12      complaints.

13          With respect to those steps, what standards were

14      you utilizing in coming to your opinions?

15  A   Well, what standards I'm utilizing are basically the

16      standards that we know now what we did not know in the

17      '70s, and only marginally in the '80s; that it is a

18      very serious and very important responsibility for an

19      airline to go beyond legality, beyond regulations, and

20      pay very strict attention to whatever might cause

21      human upset in their pilots that are in the cockpits

22      of these airplanes.

23          Just complying with the letter of the law or the

24      rule of the law is not necessarily sufficient.  If you

25      have reason to believe that you've got something that

John J. Nance
11/3/08

134

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 287

1    is upsetting one or more of your people -- including a

2    major labor dispute, by the way -- your responsibility

3    to the flying public is of the highest possible level

4    to do something about it or to refrain from

5    exacerbating that problem.

6        This is a difficult thing to codify, but it is no

7    less important.

8    Q    With respect to --

9                THE VIDEOGRAPHER:  I have one minute

10   left on the tape.

11               MS. VREELAND:  Okay.

12   Q    (By Ms. Vreeland)  With respect to the steps that

13   United did take in response to her complaints, do you

14   have an opinion whether they were reasonably

15   calculated to end the harassment?

16   A    No, they -- in my view, they were very clearly not

17   reasonably calculated to end it.  Not because the

18   people who took those steps wanted to fall short of

19   it; because they were so confused, they really didn't

20   know how to do what they were doing.

21               MS. VREELAND:  Okay.  We need to

22   change the tape.

23               THE WITNESS:  Okay.

24               THE VIDEOGRAPHER:  Going off record.

25   The time is 4:51.  This is at the end of Tape No. 3.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 288

1        (Discussion off the record.)

2

3            THE VIDEOGRAPHER:  We're back on

4    record.  The time is 4:53.  This is the beginning of

5    Tape No. 4.

6    Q   (By Ms. Vreeland)  You've commented using the

7        terminology "horizontal hostility" or "lateral

8        violence."

9    A   Yes.

10   Q   I'd like you to assume that Captain Durgan was the

11       chief pilot and supervisor of Captain Stout, and that

12       Captain Wallitner was, at pertinent times, a co-flight

13       manager and supervisor of Captain Stout.

14           Given their supervisory position over her, does

15       your use of the terminology "horizontal hostility" or

16       "lateral violence" change?

17   A   No, it doesn't.  It's -- it's not so much sensitive to

18       the exact rank of -- in the command structure, as it

19       is to the idea that there are perceived -- fairly

20       clearly perceived, in fact -- strata.  Line pilots and

21       line managers are very closely akin, and your senior

22       managers above, including the fellow who was the

23       overall flight manager in Chicago, would have been a

24       tier above.  But Durgan and the others would have been

25       pretty much on an equal footing, even though

John J. Nance
11/3/08

136

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 292

1    avenicio (phonetic) consideration of this case based

2    on what I had been told.

3        And all of this really is just a -- kind of a --

4    not codification, but a notation of the different

5    elements that I was talking about.

6    Q  So that information came from you, not from any other

7       source?

8    A  That is correct.

9    Q  Counsel asked you earlier to get information at the

10      break about the date of your retention and the amount.

11      He didn't follow up and ask you that.  I will ask you

12      that.

13   A  Yeah.

14   Q  Do you recall it was October 29th, 2007, a retainer of

15      $3,600 was sent to you?

16   A  Yes.  The figure refreshes my memory.  And the date, I

17      was beginning to think was probably before the turn of

18      the year.  I had forgotten that it was as early as

19      October, but that would be correct.  I double-checked.

20   Q  And since the receipt of that retainer, you haven't

21      produced any bills?

22   A  I have not produced any bills or invoices to you.

23                    MS. VREELAND:  I have nothing

24   further.  Thank you.

25                    MR. HARPER:  Nothing further.

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

Page 293

1                    THE VIDEOGRAPHER:  Number of tapes

2      used in today's deposition were four.  This concludes

3      the deposition.

4              Going off record.  The time is 4:59 p.m.

5                              (Signature reserved.)

6                              (Deposition concluded at

7                               5:00 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

John J. Nance
11/3/08

138

f415fc71-09e3-42ee-b4b9-4a08c51740dc

Byers & Anderson
Court Reporters & Video

1

STATE OF WASHINGTON )      I, Karmen M. Fox, CCR, RPR, CRR,
2                      ) ss CCR # 1935, a duly authorized
County of Pierce       )   Notary Public in and for the State
3                          of Washington, residing at
4                          Puyallup, do hereby certify:
5

6        That the foregoing deposition of JOHN J. NANCE was
taken before me and completed on November 3, 2008, and
7   thereafter was transcribed under my direction; that the
deposition is a full, true and complete transcript of the
8   testimony of said witness, including all questions, answers,
objections, motions and exceptions;
9        That the witness, before examination, was by me
duly sworn to testify the truth, the whole truth, and
10  nothing but the truth, and that the witness reserved the
right of signature;
11

12       That I am not a relative, employee, attorney or
counsel of any party to this action or relative or employee
13  of any such attorney or counsel and that I am not
financially interested in the said action or the outcome
14  thereof;

15       That I am herewith securely sealing the said
deposition and promptly delivering the same to
16  Attorney Tyson Harper.

17       IN WITNESS WHEREOF, I have hereunto set my hand
and affixed my official seal this 4th day of
18  November, 2008.
19
20
21

_____
22  Karmen M. Fox, CCR, RPR, CRR
    Notary Public in and for the State
23  of Washington, residing at
    Puyallup.
24
25

John J. Nance
11/3/08

f415fc71-09e3-42ee-b4b9-4a08c51740dc